**Thomas W. CULLEN, Jr., Plaintiff,**

v.

**BMW OF NORTH AMERICA, INC., Defendant.**

**No. 79 C 970.**

United States District Court,
E. D. New York.

Jan. 29, 1982.

Louis J. Castellano, Jr., Garden City, N. Y., for plaintiff.

Weil, Gotshal & Manges by Kevin P. Hughes, Yvette Miller, Joseph Allerhand, New York City, for defendant.

## MEMORANDUM OF DECISION ON REARGUMENT AND ORDER

NEAHER, District Judge.

Following the Court's memorandum of decision and order dated October 28, 1981, defendant timely sought amendment of the judgment. Rules 52(b) and 59(e), F.R.Civ.P. The application has been considered, but after careful study of defendant's arguments in support of its motion, the Court adheres to its decision, revising the opinion as follows to reflect the additional authority which it believes supports the original decision.

Plaintiff, Thomas W. Cullen, Jr., seeks to recover $18,000 with interest, plus punitive damages, paid to Bavarian Auto Sales, Inc. (Bavarian), a BMW dealer formerly franchised by defendant, BMW of North America, Inc. (BMW/NA). BMW/NA is "the exclusive importer and distributor in the United States of passenger cars, parts and products manufactured by Bayerische Motoren Werks, AG." Plaintiff's Exhibit 93. A Delaware corporation, BMW/NA has its principal place of business at Montvale, New Jersey. This diversity action is now before the Court subsequent to partial summary judgment in favor of defendant and

trial without a jury on the remaining issues.[1]

The facts established at trial follow. On January 24, 1979 Cullen entered into a sales contract with Bavarian for a new 1978 BMW, Model 530i, at a price of $18,245. Having paid a deposit of $245, Cullen received a call five days later from the salesman advising that the car had arrived and requesting a check for the balance of the purchase price. Plaintiff remitted a check for $18,000, which was cashed by Bavarian, but never received the car or the return of his money.

Cullen commenced a civil action against Bavarian in New York State Supreme Court, Nassau County, which was stayed when Bavarian's president, Hans Eichler, filed a petition in bankruptcy. Cullen also filed criminal complaints with the Queens County District Attorney and the Attorney General of the State of New York, although no indictments were issued.[2] This action was subsequently commenced.

Bavarian operated continuously as an authorized BMW dealer from at least June of 1976 to February 16, 1979, on which date Eichler voluntarily terminated all agreements between Bavarian and BMW/NA. Three written franchise agreements were entered into during this time: (1) from June 1 to December 31, 1976; (2) from August 12 to December 31, 1977; and (3) from January 1 to December 31, 1978. Although no written agreement was in effect from January 1 to August 12, 1977 or from January 1 to February 16, 1979, Bavarian continued to operate as a duly franchised BMW dealer during these periods. In fact, recognizing the continuation of dealerships without formal agreement is not an unusual practice for BMW/NA. Trial Transcript at 2.125–26.

From the beginning of Bavarian's relationship with BMW/NA, the latter received indications of Bavarian's financial instability. For example, difficulty in receiving payment for cars and parts prompted BMW/NA to place Bavarian on a C.O.D. certified check basis, rather than open account status, in the latter part of 1976. Additionally, despite Bavarian's contractual obligations and BMW/NA's repeated requests, Bavarian furnished only two monthly financial statements during the several years it operated. Further, from 1976 onward, Bavarian demonstrated persistent difficulty in maintaining minimum credit lines essential to standard operation of BMW dealerships. Finally, throughout the operation of the franchise Bavarian repeatedly failed to maintain sufficient funds to enable legitimate issuance of checks to BMW/NA, other BMW dealers, and customers.

During the latter part of 1978, Bavarian's instability escalated, and BMW/NA received intensified indications of its financial irregularities and irresponsibility. For example, from July to September 1978, BMW/NA received five customer complaints against Bavarian, each of which alleged Bavarian had taken partial payment for a car but had neither delivered the vehicle nor refunded the payment. In some of these cases, Bavarian had issued checks on insufficient funds to refund deposits made by the customers. Further, during 1978, checks aggregating some $40,000 were issued by Bavarian to BMW/NA upon accounts with insufficient funds.

On October 30, 1978, BMW/NA extended an initial sixty-day period granted Bavarian to re-establish its financial viability. This period was extended to November 14, 1978, but Bavarian still failed to remedy its deficiencies by that date.

---

1. In *Cullen v. BMW of North America, Inc.*, 490 F.Supp. 249 (E.D.N.Y.1980), we granted in part defendant's motion for summary judgment, leaving for further development of facts the issues of agency by estoppel and negligence discussed herein.

2. Eichler and Bavarian were indicted for three counts of grand larceny in the second degree, the record of which was filed in the New York Supreme Court, Queens County, on March 6, 1980. Plaintiff's Exhibit 4. But apparently the indictments refer to conduct by the accused toward individuals other than Cullen. On February 5, 1981, Eichler pleaded guilty to attempted grand larceny in the second degree.

On November 15, 1978, Bavarian represented to BMW/NA that approval of funds from the Small Business Administration and Citibank was imminent, but no such approval ensued. On December 7, 1978, BMW/NA received notice from Lloyd Capital Corporation that Bavarian had established a line of credit, but a week later BMW/NA learned that Eichler had misrepresented his intention to follow through with the credit application process, had never signed a formal agreement with Lloyd, and had never paid Lloyd the $1000 required by law to be submitted prior to execution of the agreement.

In a letter dated December 18, 1978, BMW/NA notified Eichler that because of "serious and continuing deficiencies" in the dealership, BMW/NA would not offer him a 1979 dealer agreement. The deficiencies outlined in the letter were: (1) failure to observe minimum wholesale credit requirement; (2) impairment of financial reputation, including issuance of checks, later dishonored, to other BMW dealers; (3) parts accounts arrearages, including issuance of checks, later dishonored, to BMW/NA; (4) failure to observe parts inventory requirements; and (5) failure to submit year-end and monthly financial and operating statements.

Although Eichler responded to the above letter on December 29, 1978, expressing his desire to continue the dealership, BMW/NA did not reply to confirm either termination or extension of the franchise. The next contact evidences BMW/NA's recognition of the continued operation of the Bavarian franchise: it refused to authorize Eichler's proposed sale of Bavarian to an existing dealer. Had BMW/NA asserted its rights under the dealer agreement, which had expired by its own terms on December 31, 1978, it could have insisted that Bavarian remove at its own expense all BMW signs displayed publicly, refrain from using BMW trademarks, destroy all printed material bearing BMW trademarks, and cease to hold itself out as an authorized BMW dealer. Plaintiff's Exhibit 103. Further, BMW/NA could have required Bavarian to sell and deliver to BMW/NA all new BMW vehicles, parts and tools purchased by Bavarian from BMW/NA. Instead, BMW/NA allowed Eichler to continue holding out Bavarian as an authorized dealership, as evidenced by the BMW logo publicly displayed on the outside of the showroom and the use of printed materials bearing BMW trademarks.

It should be noted that August 1978 was the last time BMW/NA received payment for any cars allocated to Bavarian. Further, in December 1978 BMW/NA removed all cars it had delivered to Bavarian for failure to maintain a minimum credit structure. Yet, during January and February of 1979, the showroom contained several new BMW vehicles borrowed from other dealers, thus giving Bavarian the appearance of a viable ongoing business.

On February 13, 1979, a meeting was held to discuss the future of Bavarian. This meeting was approximately two weeks after Cullen had been denied delivery of the car, and although Cullen had not contacted BMW/NA, at the meeting BMW/NA was apprised of information that Eichler had accepted deposits from seven customers totalling $100,000 and had used the money for other purposes. Still, BMW/NA made no definitive response, and three days later Eichler voluntarily resigned the franchise. Only at that point did BMW/NA pursue its rights subsequent to termination outlined above.

■ The record is clear that Bavarian was an independently owned and operated dealership, but plaintiff seeks to hold BMW/NA liable under the doctrine of agency by estoppel. This theory must fall for lack of proof of its essential elements. It is well settled that agency by estoppel arises only when the party charged as principal intentionally or carelessly causes the belief that the putative agent is authorized to bind that party. *Karavos Compania Naviera S.A. v. Atlantica Export Corp.*, 588 F.2d 1, 11 (2d Cir. 1978); Restatement of Agency 2d § 8B; 2 N.Y.Jur., Agency §§ 25, 87. Moreover, under New York law,

"apparent or ostensible authority, or agency by estoppel, is created only by acts or neglects of the person sought to be charged as principal, and the person dealing with the ostensible agent must have known of and relied upon such acts or omissions, and such reliance must be in good faith and in the exercise of reasonable prudence." *Perry v. New York Life Ins. Co.*, 22 N.Y.S.2d 696, 701–02 (Sup.Ct. 1940).

Although plaintiff offered into evidence various public manifestations of a relationship between Bavarian and BMW/NA, he failed to prove his reliance on Bavarian's *authority to act* for BMW/NA. Similarly, there is no evidence of Cullen's belief that the transaction was entered into by or for BMW/NA. On the contrary, plaintiff's own testimony shows there was an absence of reliance on advertisements, on the similarity between the corporate names of Bavarian and BMW/NA (Bavarian Motor Works), or on the BMW logo appearing on the sales slip.

Plaintiff did testify as to his reliance on the BMW logo appearing on the outside of Bavarian's premises, but the question remains to what his reliance was directed. The testimony shows not a belief that Bavarian had authority to act for BMW/NA, but that the BMW logo represented a particular quality of cars sold at Bavarian. Since this testimony indicates, at most, Cullen's reliance on Bavarian's authority to sell BMW automobiles, plaintiff failed to carry its burden of proving the belief essential to agency by estoppel.

■ Turning to plaintiff's negligence theory, the evidence adduced at trial shows that BMW/NA unreasonably permitted Bavarian to continue holding itself out to the public as an authorized BMW dealer, and to purport to sell Cullen a car, during a period in which defendant had ample knowledge of Bavarian's precarious financial condition and history of questionable business practices. Yet, proving the unreasonableness of defendant's conduct does not establish actionable negligence. To accomplish the latter plaintiff must first sustain his burden of proving the breach of a legal duty owing by defendant to plaintiff, a violation of plaintiff's rights. *Palsgraf v. Long Island R. R.*, 248 N.Y. 339, 162 N.E. 99 (1928).

■ Defendant argues that BMW/NA owed Cullen no duty to enforce the provisions of its agreement with Bavarian, based on plaintiff's inability to claim as a third-party beneficiary under that contract. The argument is correct as far as it goes, for it is true that the parties to the agreement, in establishing their distributor/dealer relationship, expressed no intent to confer a direct benefit on ultimate consumers. In the absence of such expression, plaintiff assumes the status of an incidental beneficiary, unable to enforce contractual rights or recover for failure to perform contractual duties. *Bernal v. Pinkerton's, Inc.*, 52 App.Div.2d 760, 382 N.Y.S.2d 769 (1st Dept. 1976), *aff'd*, 41 N.Y.2d 938, 363 N.E.2d 362, 394 N.Y.S.2d 638 (1977); *Beck v. FMC Corp.*, 53 App.Div.2d 118, 385 N.Y.S.2d 956 (4th Dept. 1976), *aff'd*, 42 N.Y.2d 1027, 369 N.E.2d 10, 398 N.Y.S.2d 1011 (1977).

Nevertheless, the question remains whether BMW/NA owes the ultimate consumer a duty beyond its contractual obligations. Because neither the State judiciary nor legislature has addressed this precise question, the requirement that this Court, sitting in diversity, apply the substantive law of New York, *Erie R. R. v. Tompkins*, 304 U.S. 64, 58 S.Ct. 817, 82 L.Ed. 1188 (1938), leads to a perplexing problem. However, both the Supreme Court and the Second Circuit have provided guidance for federal courts faced with the absence of applicable State law.

In *Bernhardt v. Polygraphic Co.*, 350 U.S. 198, 76 S.Ct. 273, 100 L.Ed. 199 (1956), the majority of the Court held that the issues presented regarding a contractual arbitration provision concerned a matter of substantive law; therefore, *Erie* mandated application of State law to the agreement. Justice Frankfurter, concurring in the result, commented on the *Erie* doctrine as follows:

"One of the difficulties, of course, resulting from *Erie R. Co. v. Tompkins*, is that it is not always easy and sometimes difficult to ascertain what the governing state law is. The essence of the doctrine of that case is that the difficulties of ascertaining state law are fraught with less mischief than disregard of the basic nature of diversity jurisdiction, namely, the enforcement of state-created rights and state policies going to the heart of those rights.... As long as there is diversity jurisdiction, 'estimates' are necessarily often all that federal courts can make in ascertaining what the state court would rule to be its law."

*Id.* at 208–09, 76 S.Ct. at 279 (Frankfurter, J., concurring) (footnote omitted). See also *King v. Order of Travelers*, 333 U.S. 153, 160–61, 68 S.Ct. 488, 492–93, 92 L.Ed. 608 (1948).

Similarly, in *Commissioner v. Estate of Bosch*, 387 U.S. 456, 87 S.Ct. 1776, 18 L.Ed.2d 886 (1967), the majority of the Court held that where no decision by a State's highest court exists with respect to characterization of a property interest for purposes of estate tax liability, federal courts must apply "what they find to be the state law":

"This is but an application of the rule of *Erie R. Co. v. Tompkins, supra*, where state law as announced by the highest court of the State is to be followed. This is not a diversity case but the same principle may be applied for the same reasons, *viz.*, the underlying substantive rule involved is based on state law and the State's highest court is the best authority on its own law. If there be no decision by that court then federal authorities must apply what they find to be the state law after giving 'proper regard' to relevant rulings of other courts of the State. In this respect, it may be said to be, in effect, sitting as a state court. *Bernhardt v. Polygraphic Co.*, 350 U.S. 198 [76 S.Ct. 273, 100 L.Ed. 199] (1956)." *Id.* at 465, 87 S.Ct. at 1782.

In the Second Circuit, the Court of Appeals has expressed its "established position" as follows:

"[W]hen a federal court must determine state law, it should not slavishly follow lower or even upper court decisions but ought to consider all the data the highest court of the state would use. See Corbin, The Laws of the Several States, 50 Yale L.J. 762 (1941). Such is the established position of this court."

*Roginsky v. Richardson-Merrell, Inc.*, 378 F.2d 832, 851 (2d Cir. 1967) (on petition for rehearing) (per curiam).

More recently, the Court of Appeals has reaffirmed the principle explained in *Roginsky:*

"When there is an absence of state authority on an issue presented to a federal court sitting in diversity, as has occurred here, the federal court must make an estimate of what the state's highest court would rule to be its law."

*Cunninghame v. Equitable Life Assurance Society*, 652 F.2d 306, 308 (2d Cir. 1981). *Accord, Huff v. White Motor Corp.*, 565 F.2d 104 (7th Cir. 1977); *Orfield v. International Harvester Co.*, 535 F.2d 959 (6th Cir. 1976).

In light of the foregoing authorities, the Court is faced with the difficult task of predicting the manner in which the New York Court of Appeals would respond to identical circumstances. Since it appears no New York decision addresses the issue of negligent supervision in the context of franchise or distributor operations, we must look to applicable principles of tort liability as perceived by the New York Court of Appeals.

The question of duty turns on "whether the defendant is under any obligation for the benefit of the particular plaintiff." Prosser, Law of Torts § 53, at 324 (4th ed. 1971). In the words of then Chief Judge Cardozo, such a relation between the parties can be founded upon the foreseeability of harm:

"The risk reasonably to be perceived defines the duty to be obeyed, and risk imports relation; it is risk to another or to others within the range of apprehension."

*Palsgraf v. Long Island R. R., supra* 248 N.Y. at 344, 162 N.E. at 100.

Two recent New York decisions, *Havas v. Victory Paper Stock Co.*, 49 N.Y.2d 381, 402 N.E.2d 1136, 426 N.Y.S.2d 233 (1980), and *Pulka v. Edelman*, 40 N.Y.2d 781, 358 N.E.2d 1019, 390 N.Y.S.2d 393 (1976), are instructive in that they appear to set bounds on the recognition of duty based on foreseeability.

In *Havas*, plaintiff, an employee of Morgan Guaranty Trust Co., was injured while assisting other trust company employees in loading bales of waste paper on a truck owned and operated by defendant, a paper stock company. Plaintiff sued the paper company on a negligence theory, and defendant impleaded plaintiff's employer. The duty of the trust company toward its employees was not at issue; rather, the Appellate Division overturned the jury verdict for plaintiff on the ground that no relation existed between the defendant paper company and plaintiff from which a duty of care could arise:

> "Given the undisputed factual pattern recited above we cannot perceive any duty or obligation running from defendant Victory to plaintiff Havas .... The loading operation was carried out by Morgan employees under the supervision of plaintiff, himself a Morgan employee. The ramp belonged to Morgan and Morgan gave the order or direction to plaintiff to use the same despite the latter's judgment that he should not. Victory's driver made no decisions as to how the bales should be loaded nor did he participate in the method of loading."

*Havas v. Victory Paper Stock Co.*, 66 App. Div.2d 953, 954, 411 N.Y.S.2d 452, 453 (3rd Dept. 1978).

The Court of Appeals reversed, finding that defendant owed a duty to plaintiff based solely upon the foreseeability of the risk of harm to plaintiff and defendant's relation to the circumstances. The court identified the analytical framework through which the existence of duty must be examined notwithstanding the absence of an independently cognizable relation between the parties:

> "[I]n a case which raises such traditional negligence law queries as does the one before us the answers are still to be found in the principle so pungently phrased by Cardozo that '[t]he risk reasonably to be perceived defines the duty to be obeyed, and risk imports relation' (*Palsgraf v. Long Is. R. R. Co.*, 248 N.Y. 339, 344, 162 N.E. 99, 100). Or, as it is spelled out more precisely in the English case that is the progenitor of the foreseeability principle, '[W]henever one person is by circumstances placed in such a position with regard to another that every one of ordinary sense who did think would at once recognize that if he did not use ordinary care and skill in his own conduct with regard to the circumstances he would cause danger of injury to the person or property of the other, a duty arises to use ordinary care and skill to avoid such danger' (*Heaven v. Prender*, 11 QBD 503, 509, Britt, MR [1883] )."

*Havas v. Victory Paper Stock Co.*, 49 N.Y.2d at 386, 402 N.E.2d at 1138, 426 N.Y.S.2d at 236.

The analysis in *Havas* appears to be twofold. First, the risk of injury to plaintiff must be reasonably foreseeable. Second, the court must determine whether the defendant "bore such a relation to the circumstances as to saddle it ... with a duty to avoid the danger to be anticipated." *Id.* at 387, 402 N.E.2d at 1139, 426 N.Y.S.2d at 237. The precise circumstances in *Havas* are wholly distinct from the instant claim. Yet the process of analysis remains constant. The central idea is that the defendant, through its driver, "had a voice in directing the conduct" of the loading operation; therefore, defendant owed a duty to avoid subjecting plaintiff to the foreseeably hazardous situation to which the driver "at least acquiesced." *Id.*

In *Pulka*, the court examined the same issue, *viz.*, whether a duty may arise from foreseeability of harm, but reached the opposite conclusion. Plaintiff, a pedestrian, was struck by an automobile exiting from defendant's parking garage. The driver of

the vehicle, not a garage employee, indisputably owed a duty to the plaintiff. But the question on appeal was whether the common practice of the garage patrons of exiting without checking for pedestrians gave rise to a duty owing pedestrians by the defendant garage to take preventive measures.

Holding that no duty existed, the majority of the court examined the two possible grounds upon which the duty to control others arises:

> "Commentators have pointed out that the duty to control others arises only in the following relationships: (1) '[t]he relationship between the defendant and the person who threatens the harm to the third person may be such as to require the defendant to attempt to control the other's conduct' or (2) 'there may be a relationship between the defendant and the person exposed to harm which requires the defendant to afford protection from certain dangers including the conduct of others' (Harper & Kime, Duty to Control the Conduct of Another, 43 Yale L.J. 886, 887–888)."

40 N.Y.2d at 783, 358 N.E.2d at 1021, 390 N.Y.2d at 395.

Thus, according to *Pulka*, the relationship between the defendant and either the third-party wrongdoer or the plaintiff may give rise to a duty of care. On the facts, the majority of the court found insufficient relation between the garage and the patron-driver to impose a duty, focusing on the defendant's lack of "reasonable opportunity" to control the patron and prevent the risk of harm. Further, in distinguishing the respective responsibilities of the driver and the garage, the court again focused on the concept of the defendant's opportunity to affect the degree of risk of harm:

> "Although it is reasonable to require one person to be responsible for the negligent conduct of another in some instances, it is unreasonable to impose that duty where the realities of every day experience show us that, regardless of the measures taken, there is little expectation that the one made responsible could prevent the negligent conduct."

*Id.* at 785, 358 N.E.2d at 1022, 390 N.Y.2d at 396.

Finally, the majority in *Pulka* expressed concern with the creation of legal duty based solely upon foreseeability, stating that foreseeability determines "the scope of duty—only after it has been determined that there is a duty." *Id.* Taking what appears to be a different stance than the *Havas* majority, the court in *Pulka* appears to have concluded that since no relationship existed from which a duty could attach, foreseeability alone could not provide a basis for liability.

Yet the seeming conflict between the decisions in *Havas* and *Pulka* can be rationally resolved. The court in *Pulka* appears understandably reluctant to impose liability on a party who had insufficient relation to the wrongdoer or the plaintiff to prevent the harm. Mere foreseeability without relation cannot suffice. The distinction in *Havas* is the absence of a third-party wrongdoer. Without the additional actor between plaintiff and defendant, the analysis in *Havas* turns on the defendant's relationship to the circumstances. Liability in *Havas* was imposed because defendant had a direct voice in the risk involved; whereas, in *Pulka*, the absence of defendant's reasonable opportunity to mitigate the harmful conduct of departing motorists precluded imposition of legal duty. The essential issue in each case is identical: Does the defendant, who is at least partially responsible for the presence of hazardous circumstances or conduct have the capability to affect the degree of the risk of harm? If his relationship to either the circumstances or the intervening wrongdoer is such that he has reasonable opportunity to reduce the risk of foreseeable injury, a duty arises to do so.

■ Application of the foregoing principles leads this Court to conclude that the New York Court of Appeals would recognize a legal duty running from BMW/NA to plaintiff to prevent the risk of harm to BMW customers which results when dealers, whose financial instability and unscru-

pulous business practices are known to BMW/NA, are permitted to maintain the appearance of a responsible authorized BMW dealer subsequent to termination of the dealer agreement. The instant circumstances appear well within the bounds set by the court in *Pulka*. Not only did there exist a significant relationship between BMW/NA and Bavarian, defendant had ample opportunity to prevent Bavarian from wrongfully obtaining plaintiff's money while holding itself out as an authorized dealer.

As the facts indicate, upon expiration of the dealer agreement, three weeks prior to the sales contract with plaintiff, defendant could have caused Bavarian to remove all BMW signs, refrain from using BMW trademarks and printed materials, and cease operating as an authorized BMW dealer. Thus, as in *Havas*, defendant acquiesced to circumstances which it should have reasonably known presented a substantial risk of harm to plaintiff. Most importantly, defendant had both opportunity and capability to decrease or foreclose the risk of harm. Therefore, a duty of care arose to avoid subjecting BMW customers to the unreasonable exposure to financial injury.

Since plaintiff has met its initial burden of proving facts which give rise to a legal duty on the part of BMW/NA for the protection of its retail customers, we turn now to defendant's argument that there was no breach of that duty.

■ Defendant, in sum, argues that BMW/NA was prohibited by law from terminating the franchise on the basis of Bavarian's known financial deficiencies. Citing 15 U.S.C. §§ 1221–25 and N.Y.Gen. Bus.Law §§ 195–98, defendant claims that in the circumstances of this case Bavarian could have successfully sued to enjoin any such termination. This argument fails for several reasons. First, the federal statute cited applies only to automobile manufacturers, and not to distributors in the absence of an indication of control by the manufacturer. See, *e.g.*, *Stansifer v. Chrysler Motors Corp.*, 487 F.2d 59 (9th Cir.

1973). Second, BMW/NA's right to terminate becomes moot in light of the expiration of the dealer agreement on December 31, 1978. Third, the prohibition in N.Y.Gen. Bus.Law § 197–a against refusal to renew automobile dealer agreements provides a good faith exception, and defendant has cited no case which enjoins such refusal under circumstances as egregious as those outlined in BMW/NA's letter dated December 18, 1978, Plaintiff's Exhibit 43.

■ Stripped of its purported legal barriers to definitively respond to Bavarian's continued deficiencies and questionable business practices, defendant is left without justification for failure to discharge its duty. The evidence shows that BMW/NA unreasonably allowed Bavarian to continue using the BMW name after expiration of the dealership and after notice of Eichler's propensity for unscrupulous business dealings. The evidence further shows that BMW/NA failed to supervise the operation of the franchise during this period of Bavarian's undefined existence and increased risk to customers. Plaintiff thus proved defendant's breach of duty.

Turning to the issue of causation, defendant contends that plaintiff's injury was not a reasonably foreseeable result of BMW/NA's negligence. Citing law "long established in New York," defendant argues that Eichler's conduct constitutes an intervening criminal act and hence necessarily breaks the causal chain, insulating defendant from liability. See, *e.g.*, *Lowery v. Western Union Telegraph Co.*, 60 N.Y. 198 (1875).

■ Such a rule is by no means established in New York. Determination of proximate cause ultimately turns "upon the precise factual pattern of each individual case." *Hoggard v. Otis Elevator Co.*, 52 Misc.2d 704, 707, 276 N.Y.S.2d 681, 686 (Sup. Ct.1966), *aff'd mem.*, 28 App.Div.2d 1207, 285 N.Y.S.2d 262 (1st Dept. 1967). See also *O'Neill v. City of Port Jervis*, 253 N.Y. 423, 433, 171 N.E. 694, 697 (1930). Moreover, an intervening act, tortious or criminal, will insulate a negligent defendant from liabili-

ty only when the subsequent act could not have been reasonably anticipated by the first actor. *Lillie v. Thompson*, 332 U.S. 459, 68 S.Ct. 140, 92 L.Ed. 73 (1947); *Sherman v. Concourse Realty Corp.*, 47 App. Div.2d 134, 365 N.Y.S.2d 239 (2d Dept. 1975); Restatement of Torts 2d §§ 302B, 448–49.

The New York Court of Appeals has stated the rule as follows:

"In this regard, it was plaintiffs' burden to show that defendants' conduct was a substantial causative factor in the sequence of events that led to [the] injury (see Restatement, Torts 2d § 430; Prosser, Torts [4th ed.], § 42). Of course, the fact that the 'instrumentality' which produced the injury was the criminal conduct of a third person would not preclude a finding of 'proximate cause' if the intervening agency was itself a foreseeable hazard (see Restatement, Torts 2d, §§ 302B, 449; Prosser, Torts [4th ed.], at pp. 271–272)."

*Nallan v. Helmsley-Spear, Inc.*, 50 N.Y.2d 507, 520–21, 407 N.E.2d 451, 459, 429 N.Y. S.2d 606, 614 (1980).

Thus, the first step of analysis is to ascertain whether defendant's conduct was a substantial factor in bringing about plaintiff's harm. In other words, the Court must determine whether a reasonable person would regard BMW/NA's negligence a cause of Cullen's harm in the sense that it was "responsible" for the injury. *Hoggard v. Otis Elevator Co., supra*, 52 Misc.2d at 707, 276 N.Y.S.2d at 686; Restatement of Torts 2d § 431, Comment (a), at 429.

Here, the evidence shows that BMW/NA created a situation which afforded Bavarian the opportunity to defraud or steal from customers relying on the good reputation of BMW. Cullen walked into the showroom specifically relying on the publicly displayed BMW logo as representing a particular level of quality product. The situation here was such as to give him no notice of any deficiency in the franchise or Bavarian's relationship with BMW. BMW/NA, on the other hand, was well aware of Bavarian's impairment of BMW's reputation through various acts enumerated in the letter of December 18, 1978, yet it failed to take the available steps to prevent the further misuse of the BMW name and the misrepresentation that Bavarian continued to be an authorized BMW dealer. Moreover, knowing Bavarian's tenuous situation after expiration of the dealer agreement on December 31, 1978, BMW/NA failed to supervise its business dealings, thereby allowing Cullen to transact business with a "paper" BMW dealership lacking any tie with BMW whatsoever. These facts show that BMW/NA's conduct constituted a "substantial causative factor" in plaintiff's harm.

The second step under *Nallan v. Helmsley-Spear, Ind., supra*, requires the Court to determine whether Bavarian's intervening act was itself a foreseeable risk of BMW/NA's negligence. Stated differently,

"a wrongdoer must answer for all the consequences that may ensue in the ordinary course of events, even though such consequences are immediately and directly brought about by an intervening cause, if such intervening cause was set in motion by the original wrongdoer, or was in reality only a condition on or through which the negligent act operated to produce the injurious result. The type of intervening cause which relieves the original wrongdoer is a cause which interrupts the natural sequence of events, turns aside their course, prevents the natural and probable result of the original act or omission, and produces a different result that could not have been reasonably anticipated."

*Hoggard v. Otis Elevator Co., supra*, 52 Misc.2d at 708, 276 N.Y.S.2d at 687–88 (citations omitted).

The facts in evidence show that BMW/NA had knowledge of at least five recent incidents prior to Cullen's in which Bavarian had received partial payment for automobiles and had not delivered the cars. In some of these cases, Bavarian had issued checks on insufficient funds to refund the payments. Although the customer complaints were subsequently resolved, BMW/NA was apprised of Bavarian's pro-

pensity for unscrupulous business transactions. In this light, Eichler's conduct perpetuated rather than interrupted the "natural sequence of events" stemming from defendant's negligence. Moreover, "the exact occurrence or the precise injury" need not be foreseen. *Horstein v. General Motors Corp.*, 391 F.Supp. 1274, 1277 (S.D.N.Y. 1975). BMW/NA should have reasonably foreseen that Bavarian might have intentionally caused some financial harm to some BMW customer as a result of its original negligence, and this is sufficient.

According to the foregoing, judgment is entered for plaintiff in the amount of $18,000 plus interest thereon at the rate of 12% from April 13, 1979. Based on the evidence adduced at trial, punitive damages do not seem appropriate.

SO ORDERED.