Thomas W. CULLEN, Jr., Plaintiff-Appellee,

v.

BMW OF NORTH AMERICA, INC., Defendant-Appellant.

No. 1141, Docket 82–7118.

United States Court of Appeals, Second Circuit.

Argued May 27, 1982.

Decided Oct. 13, 1982.

Louis J. Castellano, Jr., Garden City, N. Y., for plaintiff-appellee.

Kevin P. Hughes, New York City (Weil, Gotshal & Manges, Salem M. Katsh, Yvette Miller, Richard S. Taffet, Jonathan M. Hoff, New York City, of counsel), for defendant-appellant.

Rivkin, Sherman & Levy, Washington, D. C. (Milton D. Andrews and Lance E. Tunick, Washington, D. C., of counsel), for amicus curiae, Automobile Importers of America, Inc.

Before LUMBARD, MOORE and OAKES, Circuit Judges.

LEONARD P. MOORE, Circuit Judge:

Defendant BMW of North America, Inc. ("BMW/NA") appeals from a judgment of the United States District Court for the Eastern District of New York, Honorable Edward R. Neaher, Judge, in favor of Thomas W. Cullen, Jr., in the amount of $18,000 plus interest, and from a judgment of that same court, denying defendant's motion to amend the judgment. BMW/NA is the exclusive importer and distributor in the United States of passenger cars, parts, and products manufactured by Bayerische Motoren Werke, AG. On appeal, BMW/NA claims that the district court erred in finding that it had breached a duty under New York law actively to police the methods of operation of its franchisee, Bavarian Auto Sales, Inc. ("Bavarian"), and had negligently permitted Bavarian to continue as a BMW dealer. We agree with BMW/NA that it did not owe a duty to supervise the operation of Bavarian and to terminate the franchise because of its allegedly precarious financial condition. Accordingly, we reverse the judgments of the district court.

**1.** Eichler and Bavarian were indicted, however, for three counts of grand larceny in the second degree based on Eichler's conduct toward customers other than Cullen. On February 5, 1981, Eichler pleaded guilty to attempted grand larceny in the second degree.

**2.** Bavarian and BMW/NA entered into three written franchise agreements from June, 1976

## FACTS

On January 24, 1979, Thomas W. Cullen, Jr., and his wife drove past the showroom of Bavarian and decided to shop for a car. Cullen selected a new 1978 BMW, Model 530i, at a price of $18,245, and placed a deposit of $245 on the vehicle. Although Cullen had originally been told that the car would not be available for seven to ten days, a Bavarian salesman called Cullen five days later, advising that the car had arrived and requesting a check for the balance of the amount of $18,000, which was cashed by Bavarian. However, Cullen never received the automobile or the return of his money. In fact, Hans Eichler, Bavarian's president and owner of a 60 percent interest in the franchise, had stolen and absconded with Cullen's money. At no time relevant to the transaction, however, did Cullen have any contact, in person, by telephone, or by mail, with any representative of BMW/NA.

Cullen subsequently commenced a civil suit against Bavarian in New York State Supreme Court, Nassau County. The suit was stayed after Eichler filed a petition in bankruptcy. Cullen also filed criminal complaints with the Queens County District Attorney and the Attorney General of the State of New York, but no indictments were issued.[1] In addition, Cullen brought this action based on diversity grounds against BMW/NA.

Bavarian was operating as a franchised BMW dealer, with Eichler as its principal, when BMW/NA assumed control over the distribution of BMW automobiles in March, 1975. It continued to operate as a franchised BMW dealer until February 16, 1979 when the dealership ended.[2]

Pursuant to a standard operating agreement with BMW/NA, Bavarian was respon-

to February 16, 1979: (1) from June 1 to December 31, 1976; (2) from August 12 to December 31, 1977; and (3) from January 1 to December 31, 1978. Although no written agreement was in effect from January 1 to August 12, 1977 or from January 1 to February 16, 1979, Bavarian continued to operate as a duly franchised BMW dealer during these periods.

sible for maintaining a prearranged line of credit with a financial institution to be used exclusively for the purchase of BMW vehicles. Bavarian, however, permitted its line of credit to lapse. Prior to August, 1976, Bavarian had a line of credit with the State Bank of Long Island. On August 18, 1976, however, the bank informed BMW/NA that it had terminated its relationship with Bavarian because Eichler had advised the bank that he had arranged to handle Bavarian's credit requirements from personal resources. BMW/NA experienced difficulty, however, in receiving payment for cars and parts and placed Bavarian on a C.O.D. certified check basis, rather than open account status, in the latter part of 1976.

In June, 1977, BMW/NA received a letter from the Israel Discount Bank stating that effective June 16, 1977, Bavarian had established a line of credit for $200,000. From the latter part of 1976 through August 22, 1977, the Israel Discount Bank had paid for approximately eighty-seven vehicles purchased by Bavarian even though no formal letter of credit was in effect for most of this period. The bank also paid BMW/NA for another twenty-six vehicles between September 30, 1977 and December 27, 1977. The Israel Discount Bank continued as Bavarian's credit facility through the summer of 1978. The bank paid BMW/NA for fifty-three automobiles between January 1, 1978 and August 18, 1978. In the fall of 1978, however, the bank concluded that the dealership was experiencing financial difficulty and decided not to extend further credit. The bank's decision was in part based upon certain tax levies and other legal actions filed against the Bavarian franchise. BMW/NA was unaware, however, of any tax levies filed against Bavarian or the reasons behind the Israel Discount Bank's decision to terminate Bavarian's line of credit.

At approximately the time at which Bavarian lost its line of credit, BMW/NA began receiving an increased number of cus-tomer complaints concerning the Bavarian franchise. These complaints ranged from the issuance of checks on accounts with insufficient funds to alleged delays in return of customer deposits. Although an investigation by BMW/NA revealed that all complaints had been satisfactorily resolved and all checks were covered on re-presentation. BMW/NA remained disturbed by Bavarian's continued failure to satisfy certain requirements of its contract with BMW/NA, such as submitting monthly financial statements,[3] and the increased number of checks which Bavarian had issued on accounts with insufficient funds.[4]

Eichler attempted to reassure BMW/NA of Bavarian's financial viability, indicating that he was actively negotiating with a variety of financial institutions to obtain a line of credit. By mid-September, however, Bavarian still had not been able to secure credit funds, and BMW/NA met with Eichler to discuss the future of the franchise. After reviewing the dealership's file, BMW/NA concluded that it would be difficult to terminate the Bavarian franchise at that time, without adequate written documentation certifying the dealer's deficiencies and without providing Bavarian an opportunity to correct those deficiencies. Accordingly, BMW/NA granted Bavarian sixty days to cure all deficiencies, and BMW/NA personnel closely monitored the franchise during this period. BMW/NA continued to operate as a BMW dealer and service facility and maintained the minimum number of vehicles required by its contract with BMW/NA.

At Bavarian's request, the original sixty-day period was extended until November 14, 1978. On the following day, Eichler informed BMW/NA that he had verbal approval from Citibank for credit and that he was awaiting confirmation. Although the Citibank commitment did not materialize, the Lloyd Capital Corporation ("Lloyd") ad-

---

**3.** Bavarian furnished only two monthly financial statements during the several years it operated.

**4.** During 1978, checks totalling $40,000 were issued by Bavarian to BMW/NA upon accounts with insufficient funds.

vised BMW/NA by letter dated December 7, 1978, that Bavarian had established a line of credit for $400,000 exclusively for BMW automobiles. Shortly thereafter, BMW/NA allocated seven vehicles to the Bavarian dealership and drew funds pursuant to the Lloyd letter of credit. The cash drafts were refused, however, and Lloyd informed BMW/NA that the letter of credit had been withdrawn.[5] The seven vehicles were then removed from Bavarian and were reallocated to a nearby BMW dealer. Moreover, Friedrich Hanau, vice-president of BMW/NA, immediately wrote to Eichler, setting forth the company's position that unless Bavarian corrected its continuing deficiencies within an additional sixty days, BMW/NA would serve a notice of intent to terminate the franchise. Eichler responded on December 28, 1978, indicating that he was accelerating his efforts to obtain a line of credit, and expressing his desire to continue as a BMW dealer. In early January, 1979, however, Eichler advised BMW/NA that he desired to sell his franchise to another automobile dealer. This prospective purchaser submitted an application which BMW/NA, in early February, rejected for failing to satisfy BMW/NA's established standards for a new dealership.

On February 13, 1979, BMW/NA officials again met with Eichler to discuss the future of the franchise. At this meeting, BMW/NA officials learned that Eichler had accepted deposits from customers totalling approximately $100,000 and that he had used this money for his own purposes. Three days later, BMW/NA accepted Eichler's voluntary letter of resignation.

## DISCUSSION

Cullen alleged at trial two theories of liability: (1) that Bavarian acted as BMW/NA's agent pursuant to principles of either actual agency or agency by estoppel; and (2) that BMW/NA negligently permitted Bavarian to continue as a BMW dealer because it had knowledge of Bavarian's precarious financial condition.[6] The district court rejected the first theory of liability, finding that Cullen failed to prove the essential elements supporting a theory of agency by estoppel.[7] The court held, however, that BMW/NA was liable for damages under the negligence theory, finding that Cullen had met his "burden of proving facts which give rise to a legal duty on the part of BMW/NA, for the protection of its franchisee's customers, to reasonably police the authorized use of the BMW name and supervise the operation of its franchise." *Cullen v. BMW of North America, Inc.,* No. 79 C 970, slip op. at 12 (E.D.N.Y. Oct. 28, 1981). In imposing a duty on BMW/NA, the district court found that BMW/NA "was apprised of Bavarian's propensity for unscrupulous business transactions," *Cullen v. BMW of North America, Inc.,* 531

---

5. Bavarian had never signed a formal agreement with Lloyd and had never paid Lloyd the $1,000 required by law to be submitted prior to the execution of the agreement.

6. Cullen's amended complaint alleged four separate theories of liability: (1) that Bavarian was acting as agent for BMW/NA pursuant to principles of either actual agency or agency by estoppel; (2) that BMW/NA was negligent in permitting Bavarian to continue as a dealer because it had knowledge of Bavarian's allegedly precarious financial condition; (3) that BMW/NA entered into a conspiracy with Eichler, and in fact did, defraud customers into doing business with Eichler; and (4) that BMW/NA's conduct constituted a prima facie tort. At the conclusion of discovery, BMW/NA moved for summary judgment dismissing each of Cullen's claims for relief. The

district court concluded that an actual agency relationship did not exist between BMW/NA and Bavarian. It also found no evidence to support Cullen's causes of action for conspiracy to commit fraud and prima facie tort, and dismissed those claims as well. Accordingly, only the issues of negligence and agency by estoppel remained to be tried.

7. The court specifically pointed to Cullen's failure "to prove his reliance on Bavarian's *authority to act* for BMW/NA." *Cullen v. BMW of North America, Inc.,* No. 79 C 970, slip op. at 8 (E.D.N.Y. Oct. 28, 1981) (emphasis in original). Cullen's cross-appeal from the dismissal of this claim for relief was withdrawn pursuant to a stipulation dated March 11, 1982 and filed on March 26, 1982. Accordingly, we need not address this issue on appeal.

F.Supp. 555, at 565–66 (E.D.N.Y.1982), and that as a result, "BMW/NA should have reasonably foreseen that Bavarian might have intentionally caused some financial harm to some BMW customer as a result of its original negligence ...." *Id.* The court thus concluded that where a franchisor, such as BMW/NA, has a "reasonable opportunity to reduce the risk of foreseeable injury" caused by its franchisee, *id.,* but fails to terminate its franchisee or take other appropriate action, the franchisor is negligent and is liable for damages suffered by the ultimate consumer.

■ We conclude, however, that the district court improperly determined that Cullen's injury was reasonably foreseeable, and thus erred in finding BMW/NA liable *for* negligent failure to police the methods of operation of its independent franchisee and to terminate the franchise because of Bavarian's precarious financial condition. "The law does not undertake to hold a person who is chargeable with a breach of duty toward another, with all the possible consequences of his wrongful act." *Lowery v. Western Union Telegraph Co.,* 60 N.Y. 198, 201 (1875). It is thus a well-established principle that foreseeability of injury is an indispensable requisite of negligence, and that negligence exists only when there is a reasonable likelihood of danger as the result of the act complained of. *Ward v. State of New York,* 81 Misc.2d 583, 366 N.Y.S.2d 800 (N.Y.Ct.Cl.1975). Accordingly, an intervening act, tortious or criminal, will ordinarily insulate a negligent defendant from liability when the subsequent act could not have been reasonably anticipated by the defendant. *Tirado v. Lubarsky,* 49 Misc.2d 543, 268 N.Y.S.2d 54 (N.Y.Civ.Ct.), *aff'd,* 52 Misc.2d 527, 276 N.Y.S.2d 128 (N.Y.App.Div. 1966).

■ Applying these principles to the instant action, we decline to hold BMW/NA negligent and liable for damages since it could not reasonably have anticipated the crimes committed by Bavarian's principal, Eichler. Although BMW/NA may have been aware of Bavarian's shaky financial condition, that knowledge alone gave BMW/NA no cause reasonably to anticipate that Eichler would either engage in any criminal activity or that he would abscond with customer funds. In fact, no amount of supervision by BMW/NA would have enabled it to foresee Eichler's thievery. Moreover, even though BMW/NA had notice that Bavarian had been the subject of customer complaints, most complaints were resolved, and the record does not demonstrate that there was any dishonesty or criminal intent associated with these incidents. Furthermore, we note that the district court's finding that Bavarian was an independently owned and operated dealership is sufficient to eliminate any question of control by BMW/NA. BMW/NA had no financial interest in Bavarian, did not participate in the hiring or firing of its officers or employees, or dictate its sales practices. Accordingly, we conclude that BMW/NA, even though it had knowledge of Bavarian's precarious financial condition, was not liable to Cullen for his damages under a negligence theory since it could not have reasonably foreseen Eichler's criminal activity.

Reversed.

OAKES, Circuit Judge (dissenting):

I dissent because I believe, as did the trial judge, that the injury suffered by Cullen was foreseeable; I also believe that the majority fails to give the experienced trial judge's finding to that effect the deference to which it is entitled.

In this diversity case we are of course required to turn to New York law, and one cannot discuss the questions of duty and foreseeability without reference to *Palsgraf v. Long Island Railroad,* 248 N.Y. 339, 344, 162 N.E. 99, 100 (1928), where Cardozo stated that "[t]he risk reasonably to be perceived defines the duty to be obeyed, and risk imports relation; it is risk to another or to others within the range of apprehension." *See also Macpherson v. Buick Motor*

*Co.,* 217 N.Y. 382, 394, 111 N.E. 1050, 1054 (1916) ("foresight of the consequences involves the creation of a duty"). Although the New York Court of Appeals was to say in *Pulka v. Edelman,* 40 N.Y.2d 781, 785, 358 N.E.2d 1019, 1022, 390 N.Y.S.2d 393, 396 (1976) (parking garage not liable for pedestrian injury caused by exiting car), that "[f]oreseeability should not be confused with duty," four years later it stated in *Havas v. Victory Stock Paper Co.,* 49 N.Y.2d 381, 402 N.E.2d 1136, 426 N.Y.S.2d 233 (1980) (independent trucker's employee could recover for injuries sustained while helping defendant's employee load waste paper onto truck), that "whether [the defendant] owed a duty to the plaintiff and, if it did, whether, in the face of it, [the defendant] failed to act in a reasonably prudent manner—turn largely on foreseeability." 49 N.Y.2d at 385, 402 N.E.2d at 1138, 426 N.Y.S.2d at 236. *Palsgraf,* quoted immediately thereafter by the *Havas* court, lives.

The majority opinion concludes that BMW of North America, Inc., should not be held liable for its dealer's defalcation of Cullen's money because that defalcation was "an intervening act, tortious or criminal." In other words, "no amount of supervision by BMW/NA would have enabled it to foresee [the dealer's] thievery." But New York law provides, as the common law of England before it provided, that "the criminal conduct of a third person [does] not preclude a finding of 'proximate cause' if the intervening agency was itself a foreseeable hazard." *Nallan v. Helmsley-Spear, Inc.,* 50 N.Y.2d 507, 520–21, 407 N.E.2d 451, 459, 429 N.Y.S.2d 606, 614 (1980); *Scott v. Shepherd,* 96 Eng.Rep. 525, 526 (C.P. 1773) ("The intermediate acts of Willis and Ryal will not purge the original tort in the defendant. But he who does the first wrong is answerable for all the consequential damages.").

BMW/NA sells its vehicles to the public only through dealerships. It was well aware of this dealer's habit of passing worthless checks and its inability to obtain regular financing through established commercial channels. BMW/NA protected itself by demanding and receiving only certified checks for any goods ordered by its dealer. But consumers were left to fend for themselves, while the BMW/NA dealer, armed with all the indicia of an ongoing BMW dealer from order pads to location, sign, vehicles, and parts, continued to solicit orders and accept deposits from customers. The dealer's "thievery" was sufficiently foreseeable to BMW/NA that *it* insisted upon certified checks before delivery. Why was such thievery not equally foreseeable insofar as BMW customers were concerned?

Moreover, as the New York Court of Appeals has so cogently indicated, liability concepts have broadened to reflect economic, social, and political developments. *See, e.g., Micallef v. Miehle Co.,* 39 N.Y.2d 376, 385, 348 N.E.2d 571, 577, 384 N.Y.S.2d 115, 121 (1976); *Codling v. Paglia,* 32 N.Y.2d 330, 340, 298 N.E.2d 622, 627, 345 N.Y.S.2d 461, 467–68 (1973). Allowing a defendant to shield itself from liability by conducting operations exclusively through "independent" franchisees ignores the clear "trend of the law . . . to expand the liability of an enterprise to . . . third persons injured because of activities carried on in behalf of the enterprise." Hetherington, *Trends in Enterprise Liability: Law and the Unauthorized Agent,* 19 Stan.L.Rev. 76, 76 (1966). *See also* Stone, *The Place of Enterprise Liability in the Control of Corporate Conduct,* 90 Yale L.J. 1, 76–77 (1980). Moreover, BMW/NA was in a much better position than was Cullen to determine the financial bona fides of the dealer; indeed, the only real evidence the consumer has of an automobile dealer's financial integrity is the imprimatur given the dealer by the automobile company itself—logos, trademarks, advertising layouts, cars (though here the dealer bought cars from other dealers), and parts, and, most important of all, the continuation of the dealership. Automobile company advertising customarily emphasizes the service, reliability, and integrity of

the company's dealers. Liability here can also fairly be defended as involving a measure of risk-spreading, it seemingly being fairer to saddle the franchisor with the "cost" of distribution involved in an occasional dealer's failure than to saddle the unfortunate consumer who relied upon the very existence of the franchise to put down his good money.

Thus I agree with Judge Neaher that the dealer's thievery was foreseeable and that though it was an intervening act it nevertheless did not absolve BMW/NA of responsibility; in *Scott v. Shepherd* terms, the very existence of the dealership was a squib in a crowded market.

But foreseeability is also peculiarly a question of fact. As the New York Court of Appeals said in *Havas,* 49 N.Y.2d at 388, 402 N.E.2d at 1139, 426 N.Y.S.2d at 237, "[i]t [is] particularly appropriate to leave this issue" to the finder of fact. *See also* 2 F. Harper & F. James, *The Law of Torts* § 18.8, at 1059 (1956) ("Reasonable foreseeability of harm is the very prototype of the question the jury must pass upon in particularizing the standard of conduct in the case before it."). I had supposed that the reason we have Fed.R.Civ.P. 52(a), which tells us that a district court's findings should withstand appellate review unless clearly erroneous, is to give the district court as trier of fact the same range of determination as we give a jury. Interestingly, only last April the Supreme Court not very gently reminded the courts of appeals that Rule 52 "does not make exceptions or purport to exclude certain categories of factual findings from the obligation of a Court of Appeals to accept a district court's findings unless clearly erroneous.... [I]n particular, it does not divide findings of fact into ... 'ultimate' and ... 'subsidiary' facts." *Pull-*

*man-Standard v. Swint,* —— U.S. ——, ——, 102 S.Ct. 1781, 1789, 72 L.Ed.2d 66 (1982). Thus because I do not think that the district court's finding of foreseeability was clearly erroneous, I would affirm even if I had some doubt on the foreseeability question. But in light of the applicable New York cases, I do not have even such a doubt.

And if the entire issue were restated in terms of duty rather than in terms of foreseeability, as the New York Court of Appeals in *Pulka v. Edelman, supra,* suggested may be a separate and distinct question (*sed quaere*), I would refer only to *Hendrickson v. Hodkin,* 276 N.Y. 252, 11 N.E.2d 899 (1937) (holding a hospital liable for permitting a quack doctor to treat a patient on its premises); *De Ryss v. New York Central Railroad Co.,* 275 N.Y. 85, 9 N.E.2d 788 (1937) (landowner who permits a third person to hunt under circumstances indicating to a reasonably prudent man that it is dangerous to do so is liable to others injured as a result); and Note, *Liability of a Franchisor for Acts of the Franchisee,* 41 S.Cal. L.Rev. 143 (1968). Here BMW/NA clearly could have terminated the dealership and indeed had a duty to do so in light of the dealer's instability and unscrupulousness, before the dealer took Cullen's deposit.[1]

---

1. I would agree with the district court that there would be no violation of the Automobile Dealers' Day in Court Act, 15 U.S.C. §§ 1221–1225 (1976), by termination in this case. *David R. McGeorge Car Co. v. Leyland Motor Sales, Inc.,* 504 F.2d 52 (4th Cir. 1974), *cert. denied,* 420 U.S. 992, 95 S.Ct. 1430, 43 L.Ed.2d 674 (1975). It may not be amiss to say that I am extremely confident that the author of the majority opinion would not disagree with this conclusion either. *See Pierce Ford Sales, Inc. v. Ford Motor Co.,* 299 F.2d 425 (2d Cir.), *cert. denied,* 371 U.S. 829, 83 S.Ct. 24, 9 L.Ed.2d 66 (1962).