WHATLEY, Judge,
Concurring in part and dissenting in part.
I respectfully dissent because I conclude that the trial court correctly submitted the case to the jury on the counts of negligence and apparent agency. Although the franchise agreement was with Mr. Scott *35 and required that the elusive Mr. Scott and his wife would be on site 80% of the time, by at least 2002 or 2003, Prewett was in control of the daily operations of SFS. The record reflects that Dan Prewett was the alpha and omega of the Sarasota Jackson Hewitt office on Beneva Road. He was the one in charge when Jackson Hewitt called. He was the one in charge when Jackson Hewitt visited. Scott and his wife were eternally absent. I am uncertain what type of background check was performed by Jackson Hewitt on Scott. I am certain one was never performed on Prew-ett.
Prewett was no stranger to Ponzi schemes. See People v. Prewett, 126 A.D.2d 86, 513 N.Y.S.2d 282 (N.Y.App.Div.1987). Even though he was a convicted felon and con artist, he had unbridled domain in the Jackson Hewitt office. He used that office to falsify tax returns, sell cocaine, and scam the Kamans out of $575,000.[5] His conduit to crime was the Jackson Hewitt brand and a corporation initially named Jackson Hewitt Investment Services, Inc. Armed with the Jackson Hewitt name, he assured the Kamans that their investment was backed by Jackson Hewitt. He made the pitch in the Jackson Hewitt office wearing a Jackson Hewitt shirt with the company logo. The address and telephone number for Jackson Hewitt and Jackson Hewitt Investment Services, Inc., were identical. The Kamans’ reliance on Prewett’s representation was understandable.
Jackson Hewitt’s duty to the Kamans arises from the concept of foreseeability. Curd, 39 So.3d at 1227-28. As early as 2002, Jackson Hewitt had notice of Prew-ett’s conduct and failed to take any appropriate action to investigate or deter the conduct. Jackson Hewitt’s inaction in the face of notice invited the jury verdict.
In July 2002, Mary Yalmont e-mailed Jackson Hewitt asking for written information on “Jackson Hewitt’s Money Market Acet/Mortgage Investment Acct.” She noted she could not find such information on the Jackson Hewitt website. The Jackson Hewitt response was, in part, “please let me know where that information came from.” Valmont immediately informed Jackson Hewitt that the information came from Prewett in the Sarasota Jackson Hewitt office on Beneva Road. When Val-mont confronted Prewett with the belief that her investment was not backed by Jackson Hewitt, he assured her otherwise. This additional mischief of Prewett was communicated to Jackson Hewitt by Val-mont. Her e-mail stated,
I spoke to Dan later this afternoon and he directed me to the website for Simple Financial Solutions, Inc. The home page indicates that that [sic] are several “wholly owned subsidiaries or licensed affiliates” of Jackson Hewitt. JHIS[6] is one of these groups. Dan explained to me that the Jackson Hewitt Southern Tier is separate from the NJ office.[7]
These brazen lies were glazed over and put aside by Jackson Hewitt. Specifically, Jackson Hewitt waited five weeks before writing to Scott. Jackson Hewitt told Scott that inappropriate use of Jackson Hewitt trademarks led to customer confusion. It also told Scott that he was violating the franchise agreement and that he must rename and no longer associate the investment services with Jackson Hewitt’s name, send a letter to clients advising *36 them of the lack of affiliation with Jackson Hewitt, and sign a special stipulation.
Three weeks later a letter bearing Scott’s name informed Jackson Hewitt that in spite of operating an investment business named Jackson Hewitt Investment Services, Inc., from the Jackson Hewitt office, no inappropriate conduct had occurred. Scott (and/or Prewett) refused to sign the stipulation, refused to stop the selling of investments, and refused to send a letter to clients. Jackson Hewitt was told that the corporate name may be changed “as a courtesy.” The name was ultimately changed to J.H. Investment Services, Inc., still using the address and telephone number of Jackson Hewitt. This “change” is a classic distinction without a difference, and the new name was also a violation of the franchise agreement. The franchise agreement stated, “you agree not to use JH, JH1, JTAX, Jackson Hewitt or such other names as we may specify as any part of the legal name of the franchise.” Thus, the Jackson Hewitt franchise agreement foresaw the confusion of using the names Jackson Hewitt or J.H. Prewett used both with impunity.
Business as usual continued unabated for Prewett. In taking no further action, Jackson Hewitt failed to act in an appropriate or meaningful way. This must be measured against the backdrop of Jackson Hewitt’s prior letter advising of a violation of the franchise agreement. Jackson Hewitt rewarded Scott and/or Prewett with even more franchises in the Sarasota market, while turning a blind eye as franchise revenues continued to flow.
Significantly, Prewett never received permission to operate any other business from the Jackson Hewitt location. The franchise agreement specifically stated, “as part of a franchise organization, we require that you receive written approval from the National Headquarters before you 1) operate another business out of your Jackson Hewitt location or 2) offer non-Jackson Hewitt related products and/or services out of your Jackson Hewitt location.”
Adam Tuchman was an internal auditor for Jackson Hewitt. In November 2004, he conducted what was called a “royalty audit” of the subject business. (I can only assume no Jackson Hewitt audit is more stringent than one captioned “royalty.”) An employee informed Tuchman that “financial consulting” was being provided to customers. Therefore, Jackson Hewitt once again had notice that its franchise was conducting financial consulting in violation of the franchise agreement. Also in 2004, the franchisor was again advised of franchise violations in the form of unauthorized websites and unapproved internet advertisements. Withholding of funds and termination of the franchise were threatened. In a letter to Scott, Jackson Hewitt confirmed they were “seeking to properly and consistently promote the brand.”
Based on these facts, I conclude that the negligence count against Jackson Hewitt was properly submitted to the jury. The majority concedes all of the elements except duty are questions for the trier of fact. In citing Curd, 39 So.Bd at 1227-28, the majority recognizes that duty may arise from the general facts of a case. Further, the majority notes the defendant’s conduct must create or control the risk before liability may be imposed. I concede Jackson Hewitt did not create the risk. I differ from the majority in that I believe Jackson Hewitt controlled the risk. As noted above, Jackson Hewitt was twice given notice that an unauthorized business was being conducted at its Beneva Road location in Sarasota. It knew the business involved investments, as the very name(s) Prewett used gave notice of this. It knew Prewett was telling clients that their in *37 vestments were backed by Jackson Hewitt. It knew these matters were franchise violations. Jackson Hewitt had control as evidenced by its letters to the franchisee. It even had the ultimate control — it could terminate the franchise. Jackson Hewitt in fact made demands to the franchisee but allowed those demands to remain unmet. These matters created a jury question.
Cullen, 691 F.2d 1097, is distinguishable. There the dealership president stole a customer’s money. The customer sued BMW on a negligence claim but ultimately did not prevail because the customer merely asserted that BMW knew the dealership’s president was in a precarious financial condition. That sole factor is markedly different from Jackson Hewitt’s knowledge of Prewett’s operations and his numerous and ongoing falsehoods. The majority equates BMW’s knowledge to Jackson Hewitt’s and concludes that Jackson Hewitt “had no reason to anticipate [Prewett’s] chicanery.” To the contrary under these facts, I believe Jackson Hewitt had every reason to anticipate mischief.
As to the apparent agency/authority count, this also presented a jury question under the facts of this case. Taco Bell of Cal., 324 So.2d at 123 (“This issue of apparent authority often presents a mixed question of law and fact, and is one which should be submitted to the jury under appropriate instructions.”) (citation omitted). Roessler v. Novak, 858 So.2d 1158 (Fla. 2d DCA 2003), is instructive. In Roessler, this court stated,
Apparent authority is authority which a principal knowingly tolerates or permits, or which the principal by its actions or words holds the agent out as possessing. The rationale for the doctrine of apparent authority is that a principal should be estopped to deny the authority of an agent when the principal permitted an appearance of authority in the agent and, in so doing, justified a third party’s reliance upon that appearance of authority as if it were actually conferred upon the agent.
Id. at 1161 (citation omitted); see also Kennedy v. Sizzlin Corp., 857 So.2d 71, 77 (Ala.2003). Armed with notice of Prew-ett’s falsehoods and franchise violations, Jackson Hewitt did nothing of a meaningful sort. It is this compelling knowledge coupled with tolerance and inaction that creates the jury question of apparent agency. The representation by the purported principal, Jackson Hewitt, was the acknowledgment and inaction. Jackson Hewitt was on clear notice that Prewett was hawking his investments under the guise that they were backed by Jackson Hewitt. Thus, the appearance of an agency relationship was known and tolerated.
The remaining question as to apparent agency is whether each individual investor had to make a separate inquiry of Jackson Hewitt to invoke liability. I believe the answer to this query is in the negative. The Valmont communication was sufficient to alert Jackson Hewitt of the apparent agency scenario. It would be entirely implausible to believe the Prewett representation that the investments were backed by Jackson Hewitt would cease with Mary Yalmont.
I agree with the majority that the trial court correctly entered summary judgment for Jackson Hewitt on the actual agency count. However, I believe that the trial court likewise correctly submitted the case to the jury on the counts of negligence and apparent agency and I would affirm.

. This scheme scammed dozens of other investors. Those investors are not parties to this appeal.

. Jackson Hewitt Investment Services, Inc.

. Jackson Hewitt’s home office is in New Jersey.