WALLACE, Judge.
In this appeal, Jackson Hewitt, Inc., a franchisor, asks us to decide whether it can be held liable to Frank A. Kaman and Ellen M. Kaman, investors defrauded by an affiliate of one of its franchisees. On the facts presented, we hold that Jackson Hewitt is not liable to the Kamans. Accordingly, we reverse the final judgment entered on the jury’s verdict in the Ka-mans’ favor. On the Kamans’ cross-appeal, we affirm the partial summary judgment that dismissed one of their claims against Jackson Hewitt.
I. THE FACTS

A. Introduction

Frank A. Kaman, a dentist, and Ellen M. Kaman, his wife, lost a substantial sum of money in a fraudulent real estate investment scheme promoted by Daniel L. Prew-ett and J.H. Investment Services, Inc. *23 (JHIS). JHIS shared office space with Simple Financial Solutions, Inc. (SFS), which held the Jackson Hewitt Tax Service franchise in Sarasota. Prewett was an officer of both JHIS and SFS.
By the time the Kamans learned that their investment was lost, JHIS and Prew-ett were judgment-proof. The Kamans understandably looked for a deep pocket. In an attempt to recoup their losses, they sued SFS’s franchisor, Jackson Hewitt. The issues in this case concern whether Jackson Hewitt can properly be held liable for the consequences of the fraud perpetrated by Prewett and JHIS.

B.The Jackson Hewitt Tax Service Franchise

Jackson Hewitt is a national franchisor with several thousand franchisees. In accordance with detailed franchise agreements, Jackson Hewitt franchises independently owned and operated entities to use its registered mark, “Jackson Hewitt Tax Service,” and its proprietary software for the preparation of individual income tax returns. Jackson Hewitt is not in the investment business, and it does not sell or promote investment products or services. Although the franchisees can arrange refund anticipation loans for customers, Jackson Hewitt does not authorize its franchisees to provide investment products or services.
Because the business of preparing individual income tax returns is seasonal, Jackson Hewitt franchisees often provide complementary services at their locations through other entities. Under its franchise agreement, Jackson Hewitt retains the right to approve or disapprove the offering of such additional services. The nature of the complementary services provided at Jackson Hewitt Tax Service offices tends to vary from location to location. But the services frequently offered include the preparation of corporate tax returns, bookkeeping, accounting, and check cashing.

C. Simple Financial Solutions, Inc. (SFS)

In October 1993, Jackson Hewitt granted an initial franchise in Sarasota to SFS. Allan Scott was the applicant for the Sarasota franchise. Jackson Hewitt did a standard background check on Scott, and the results were unremarkable.
SFS operated its franchise successfully, and it eventually grew to have multiple locations in the Sarasota area. SFS’s main office was in a strip mall known as “Jackson Hewitt Plaza” located on Beneva Road in Sarasota. In addition to the preparation of individual income tax returns, the services available at SFS’s locations included the preparation of corporate tax returns, bookkeeping, and accounting. J.H. Accounting Services, Inc., a Florida corporation formed in 1997, was the entity that provided these additional services.
The record does not disclose the extent of Allan Scott’s involvement at SFS and its related businesses during the early years of their operations. However, beginning at least in 2002 or 2003, Prewett, who had his office in the Beneva Road location, was in control of daily operations. Employees, customers, and other visitors to the Bene-va Road office never saw Scott. A newsletter published for SFS during this period referred to Allan Scott as the “President” of the business and gave his location as the “NY office.” The same newsletter described Prewett as the “CEO/CFO.”

D. J.H. Investment Services, Inc. (JHIS)

Prewett used JHIS as the vehicle to conduct his fraudulent real estate investment scheme. JHIS was incorporated in *24 Florida in 1996 under the name “Jackson Hewitt Investment Services, Inc.,” without Jackson Hewitt’s knowledge or approval. By 2003, when real estate prices were rising rapidly in Florida and elsewhere, Prewett was using JHIS for his real estate swindle. Our record discloses very little about the early operations of JHIS. However, before 2003, JHIS was purporting to hold funds for at least one participant in a “money market account.” This participant was Mary Valmont.

E. The Valmont-Cort E-mail Exchange

On July 19, 2002, Mary Valmont sent two e-mails to Sheila Cort at Jackson Hewitt’s corporate headquarters in New Jersey. Cort was Jackson Hewitt’s vice president for corporate communications. Valmont’s first e-mail said: “I am a J-H client. I would like some written info on J-H’s Money Market Acct/Mortgage Investment Accts. I could not find any info on your website.” Cort immediately responded for Jackson Hewitt as follows:
As you know, Jackson Hewitt Tax Service is a tax preparation service. We provide preparation of federal and state income tax, as well as accelerated check requests, refund anticipation loans and electronic filing. We do not offer Money Market Accounts or Mortgages. If you’ve been informed otherwise, please let me know where that information came from so that I may investigate.
After this e-mail exchange, Cort and Val-mont spoke by telephone. In response to Cort’s request for additional information, Valmont faxed Cort a copy of an account statement bearing the name “Jackson Hewitt Investment Services, Inc.,” and the address of the SFS office on Beneva Road.[1]

F. Jackson Hewitt’s Response to the Information Provided by Valmont

After informing Valmont that Jackson Hewitt was not associated with JHIS or any investment programs, Cort referred to Curt M. Hapward (Jackson Hewitt’s then vice president for franchise sales administration and compliance) the information that Valmont had provided. Hapward did not know what entity was improperly using Jackson Hewitt’s name. On August 26, 2002, he sent a default letter to Allan Scott at one of the SFS offices. Hap-ward’s letter said, in pertinent part:
I have recently been advised that you are inappropriately using the Jackson Hewitt and/or Jackson Hewitt Tax Service trademarks. Specifically, you have incorporated and run “Jackson Hewitt Investment Services, Inc.” As you know, this has led to customer confusion as Jackson Hewitt Inc. does not provide these services to consumers through our franchisees.
Hapward continued by demanding that Scott rename JHIS and disassociate its activities from the Jackson Hewitt name.
On September 16, 2002, Scott responded to Hapward by letter. Scott told Hapward that Scott had no ownership interest in JHIS. Also, SFS did not operate JHIS; it was an independent corporation. Scott explained further:
Jackson Hewitt Investment Services, Inc. was incorporated in 1996 to purchase land and buildings to lease to me for the establishment of tax offices. To do so, they established an investment/mortgage program to raise capital to finance the acquisitions of real estate. They do not advertise to the public, do *25 not have a logo, do not use Jackson Hewitt typeface, fonts, colors or anything similar to Jackson Hewitt, Inc. or Jackson Hewitt Tax Service....
In their six years of operation we have never had a complaint or problem. The inquiry that prompted your letter was as a result of an inherited account, and the party receiving same was not a party to the original investment group and was not familiar with the program. As of the date she contacted Jackson Hewitt, she had not read the disclaimers and disclosures provided on the ba[c]k of her statements....
The company is owned by of [sic] six family members and six outside investors. As I do not own any part of the company, I am not in a position to tell the Board of Directors and Shareholders what they can or cannot do.
Finally, Scott offered to speak with JHIS about a change of its corporate name. In a follow-up letter, Scott informed Hapward that the principals of JHIS had agreed to change the corporate name to “J.H. Investment Services, Inc.,” effective January 1, 2003. The name change was made as promised.

G. Jackson Hewitt Lacked Knowledge of the Fraud

Scott’s representations to Hapward were reassuring, but mainly false. However, Hapward and Jackson Hewitt had no reason to doubt the truth of Scott’s claims. In 2002, Jackson Hewitt had already enjoyed an uneventful relationship with Scott and SFS for nine years. After Valmont sent her e-mails and spoke with Cort on July 19, Jackson Hewitt never heard from Valmont again. Indeed, the e-mails from Valmont were the only inquiry that Jackson Hewitt ever received about the activities of Prewett and JHIS until one year after the Kamans had made their last investment with JHIS. Although field representatives from Jackson Hewitt visited the SFS offices in Sarasota from time to time, none of them ever learned that Prewett was marketing real estate investments from his office on Beneva Road.

H. Prewett’s Arrest and Its Aftermath

In October 2006, Prewett was arrested on federal money laundering and drug trafficking charges. United States v. Oscher (In re J.H. Inv. Servs., Inc.), No. 8:10-cv-1394-T-JSM, 2010 WL 3943952, at *1 (M.D.Fla. Oct. 7, 2010). After his arrest, Prewett caused JHIS to transfer various parcels of real estate into his own name. Id. He then pledged these properties as security for his bail. Id. After making bail, Prewett fled to Italy. Id. Later, he was extradited and returned to the United States. Id. A jury found Prewett guilty, and he was sentenced to serve 216 months in federal prison. United States v. Prewett, 340 Fed.Appx. 639, 640 (11th Cir.2009).
After Prewett’s arrest, Jackson Hewitt terminated SFS’s franchise. SFS sold its business to a third party. In May 2007, creditors initiated involuntary bankruptcy proceedings against Prewett and JHIS. Oscher, 2010 WL 3943952, at *1. The bankruptcy trustee located approximately forty real estate properties that he might be able to sell. Id. Many of these properties were subject to mortgages. Id.

I. The Kamans Invest with JHIS

In 2003, the Kamans decided to move from the Chicago area to Sarasota. Dr. Kaman sold his existing dental practice and made arrangements to purchase another practice in Sarasota. Dr. Kaman first met Prewett at SFS’s Beneva Road office in the summer of 2003. Dr. Kaman was already familiar with Jackson Hewitt Tax Service and knew that it had offices *26 nationwide. Whenever the two men met, Prewett was always wearing a shirt bearing the Jackson Hewitt logo. After Dr. Kaman opened his Sarasota office in February 2004, he allowed J.H. Accounting to handle his bookkeeping.
On several occasions, Prewett offered to help Dr. Kaman with investments. One of the options Prewett suggested was investing in real estate. Prewett assured the Kamans that Jackson Hewitt stood behind the proposed investment. Based on such assurances and the promise of large returns, the Kamans decided to begin investing in real estate joint ventures with Prew-ett.
On November 10, 2004, the Kamans wrote a check to JHIS for $100,000, representing their initial investment. From that date through October 17, 2005, the Kamans transferred additional funds to JHIS until the total amount of their investment reached $575,000. To the extent that properties were actually purchased, it appears that JHIS held title to the properties. All of the investments were memorialized by joint venture agreements between the Kamans and JHIS. Notably, Jackson Hewitt’s name did not appear anywhere in the joint venture agreements. In addition, Prewett did not give the Ka-mans any prospectus, brochure, application, or other document suggesting that Jackson Hewitt sponsored, monitored, or was otherwise involved in the proposed investments. The joint venture agreements specifically acknowledged the possibility that the participants might incur losses.
After Dr. Kaman heard about Prewett’s arrest, he called Prewett and asked for the return of his money. Prewett replied that it was impossible for him to return the money immediately because it was invested in real estate. Prewett assured Dr. Kaman that he and Mrs. Kaman should not worry because their investment was “safe.” Despite the Kamans’ understandable concerns following Prewett’s arrest, they never contacted Jackson Hewitt to inquire about its role, if any, in Prewett’s investment program.
II. THE PROCEDURAL BACKGROUND
In December 2006, the Kamans filed an action against Prewett and JHIS. Soon, they added Jackson Hewitt as a defendant in the action, but they did not make a claim against Jackson Hewitt’s franchisee, SFS. In their third amended complaint, the Kamans asserted claims against Jackson Hewitt based on negligence, apparent agency, and actual agency. The third amended complaint also included a request for an award of punitive damages against Jackson Hewitt. The trial court entered a summary judgment that dismissed the Ka-mans’ claim based on actual agency. Before trial, the Kamans dropped Prewett and JHIS as defendants.
The Kamans went to trial against Jackson Hewitt on their claims based on negligence and apparent agency.[2] Jackson Hewitt timely moved for a directed verdict on the negligence and apparent agency claims, but the trial court denied its motion. A jury found in favor of the Kamans on both of their remaining claims but declined to award punitive damages. The trial court entered a judgment on the jury’s verdict in favor of the Kamans and against Jackson Hewitt for $575,000, plus $264,332 in prejudgment interest, for a *27 total award of $889,882. This appeal followed.
III. THE PARTIES’ POSITIONS ON APPEAL
On its direct appeal, Jackson Hewitt raises multiple issues. We need only address Jackson Hewitt’s challenge to the trial court’s denial of its motion for directed verdict on the Kamans’ negligence and apparent agency claims. On the cross-appeal, the Kamans argue that the trial court erred in granting the partial summary judgment dismissing their claim based on actual agency. The Kamans’ arguments on the cross-appeal are without merit and do not warrant further discussion.
IV. THE STANDARD OF REVIEW
We apply the de novo standard of review to a trial court’s ruling on a motion for directed verdict. Fell v. Carlin, 6 So.3d 119, 120 (Fla. 2d DCA 2009). In our review, we apply the same test that the trial court applies in ruling on the motion. Id. This court has previously stated this test as follows:
A motion for directed verdict should be granted only where no view of the evidence, or inferences made therefrom, could support a verdict for the nonmov-ing party. In considering a motion for directed verdict, the court must evaluate the testimony in the light most favorable to the nonmoving party and every reasonable inference deduced from the evidence must be indulged in favor of the nonmoving party. If there are conflicts in the evidence or different reasonable inferences that may be drawn from the evidence, the issue is factual and should be submitted to the jury.
Sims v. Cristinzio, 898 So.2d 1004, 1005 (Fla. 2d DCA 2005) (citations omitted).
V. NEGLIGENCE

A. Introduction

At trial, Jackson Hewitt moved for a directed verdict on the Kamans’ claim based on negligence. Jackson Hewitt argued, among other things, that the Ka-mans had failed to establish that Jackson Hewitt owed a legal duty to the Kamans to prevent the fraud perpetrated by Prewett and JHIS. The Kamans responded that Jackson Hewett knew that its franchisee’s affiliate, JHIS, was offering investments out of one or more of the franchise locations. The Kamans argued that Jackson Hewitt had the contractual ability to require SFS to halt this activity, but Jackson Hewitt failed to act. According to the Kamans, Jackson Hewitt had a legal duty to act arising out of the circumstances of the case. After a thorough review of the parties’ arguments and the voluminous record, we conclude that the Kamans did not establish a duty owed by Jackson Hewitt to the Kamans to prevent the actions of Prewett and JHIS that resulted in the Kamans’ financial losses.

B. Negligence and the Concept of Dutg

We begin our analysis of the negligence claim with a brief review of the elements of a cause of action for negligence and the concept of duty. The four elements of a negligence claim are as follows:
1. A duty, or obligation, recognized by the law, requiring the [defendant] to conform to a certain standard of conduct, for the protection of others against unreasonable risks.
2. A failure on the [defendant’s] part to conform to the standard required: a breach of the duty....
3. A reasonably close causal connection between the conduct and the resulting injury. This is what is commonly *28 known as “legal cause,” or “proximate cause,” and which includes the notion of cause in fact.
4. Actual loss or damage-
Clay Elec. Coop., Inc. v. Johnson, 873 So.2d 1182, 1185 (Fla.2003) (alterations in original) (quoting W. Page Keeton et al., Prosser and Keeton on the Law of Torts § 30, at 164-65 (5th ed. 1984)).
Of the four elements of a negligence claim, breach, causation, and damages are generally questions to be decided by the trier of fact. Estate of Johnson v. Badger Acquisition of Tampa LLC, 983 So.2d 1175, 1180 (Fla. 2d DCA 2008). However, the determination of whether a duty is owed presents a question of law to be determined by the court. Id. “The duty element of negligence is a threshold legal question; if no legal duty exists, then no action for negligence may lie.” Jenkins v. W.L. Roberts, Inc., 851 So.2d 781, 783 (Fla. 1st DCA 2003).
In its recent decision in Curd v. Mosaic Fertilizer, LLC, 39 So.3d 1216, 1227-28 (Fla.2010), our supreme court reviewed the four ways in which a duty in tort may arise:
Under Florida law, the question of whether a duty is owed is linked to the concept of foreseeability. We have held that duties may arise from four general sources: (1) legislative enactments or administrative regulations; (2) judicial interpretations of such enactments or regulations; (3) other judicial precedent; and (4) a duty arising from the general facts of a case. Clay Elec., 873 So.2d at 1185 (citing McCain v. Fla. Power Corp., 593 So.2d 500, 503 n. 2 (Fla.1992)). The fourth category encompasses “that class of cases in which the duty arises because of a foreseeable zone of risk arising from the acts of the defendant.” McCain, 593 So.2d at 503 n. 2.
“Where a defendant’s conduct creates a foreseeable zone of risk, the law generally will recognize a duty placed upon defendant either to lessen the risk or see that sufficient precautions are taken to protect others from the harm that risk poses.” McCain v. Fla. Power Corp., 593 So.2d 500, 503 (Fla.1992). “To impose a duty, it is not enough that a risk merely exists or that a particular risk is foreseeable; rather, the defendant’s conduct must create or control the risk before liability may be imposed.” Demelus v. King Motor Co. of Fort Lauderdale, 24 So.3d 759, 761 (Fla. 4th DCA 2009) (citing Aguila v. Hilton, Inc., 878 So.2d 392, 395, 396-97 (Fla. 1st DCA 2004)). “As to duty, the proper inquiry for the reviewing appellate court is whether the defendant’s conduct created a foreseeable zone of risk, not whether the defendant could foresee the specific injury that actually occurred.” McCain, 593 So.2d at 504. With these basic principles in mind, we turn to an examination of the question of duty in the context of this case.

C. Duty and the Prevention of Misconduct by Others

The Kamans’ argument in favor of the existence of a duty posits that Jackson Hewitt was obligated to prevent Prewett and JHIS from engaging in conduct that was at least fraudulent and possibly criminal in nature. Thus the Kamans’ position is at odds with the general common law rule “that there is no duty to prevent the misconduct of third persons.” Michael & Philip, Inc. v. Sierra, 776 So.2d 294, 297 (Fla. 4th DCA 2000) (citing Trianon Park Condo. Ass’n v. City of Hialeah, 468 So.2d 912 (Fla.1985)). Of course, there are limited circumstances in which an actor may have a duty to prevent intentional or criminal conduct by another.
The first category of exceptions arises when “there is a special relationship *29 between the defendant and the person whose behavior needs to be controlled or the person who is a foreseeable 'victim of such conduct.” Palmer v. Shearson Lehman Hutton, Inc., 622 So.2d 1085, 1089 (Fla. 1st DCA 1993) (citing Boynton v. Burglass, 590 So.2d 446 (Fla. 3d DCA 1991)). “Implicit in the special relationship exception to this general rule is the concept that, when relying on a special relationship between the defendant and the person whose conduct needs to be controlled, the defendant must have the right or ability to control the third person’s conduct.” Id. (citing Garrison Ret. Home Corp. v. Hancock, 484 So.2d 1257 (Fla. 4th DCA 1985)).
The second category of exceptions to the general rule has been stated as follows:
[T]he duty to protect strangers against the tortious conduct of another can arise if, at the time of the injury, the defendant is in actual or constructive control of:
1. the instrumentality;
2. the premises on which the tort was committed; or
3. the tort-feasor.
Daly v. Denny’s, Inc., 694 So.2d 775, 777 (Fla. 4th DCA 1997) (citing Vic Potamkin Chevrolet, Inc. v. Horne, 505 So.2d 560, 562 (Fla. 3d DCA 1987) (en banc), approved, 533 So.2d 261 (Fla.1988)). The second category of exceptions has generally been applied in negligence actions involving claims for personal injury or death rather than, as in this case, a claim for an economic injury. Cf. Kafka v. Wachovia Bank, N.A., 218 Fed.Appx. 960, 962 (11th Cir.2007) (noting a distinction between an asserted breach of a duty to unknown persons in the commercial context and in cases involving alleged torts that result in physical harm).

D. Analysis

In this case, no duty to prevent the fraudulent and possibly criminal conduct of Prewett and JHIS arises. First, Jackson Hewitt had no special relationship with the Kamans or others to protect them from the misconduct of Prewett and JHIS. And Jackson Hewett had no special relationship with either Prewett or JHIS which would have required it to control their behavior.
Assuming that the second category of exceptions is applicable to a claim for a purely economic injury, the facts of this case do not meet any of the three circumstances recognized as exceptions to the rule. First, there is no instrumentality at work here. Second, because SFS owned or leased the offices from which it operated, Jackson Hewitt was not in control of the premises where the tort was committed. And, third, Jackson Hewitt was not in control of either Prewett or JHIS. Jackson Hewitt had no contractual relationship with either Prewett or JHIS. Prewett was employed by SFS, not Jackson Hewitt, and JHIS was an independent corporate entity.[3] Under these circumstances, Jackson Hewitt had no duty to the Kamans, and the Kamans did not meet the threshold requirement necessary to establish their negligence claim. See Cantalupo v. Lewis, 47 So.3d 896, 900 (Fla. 4th DCA 2010) (stating that one of two brothers did not have a duty to prevent the other brother from driving under the influence of alcohol); Demelus, 24 So.3d at 765-66 (holding that an automobile dealership which kept its cars locked in a secured lot did not create a foreseeable zone of risk of third-party criminal conduct by a juvenile gang that stole vehicles from the lot, one *30 of which collided with another vehicle and injured the driver); Pompano Motor Co. v. Chrysler Ins. Co., 875 So.2d 754, 757-58 (Fla. 4th DCA 2004) (holding that an automobile dealership had no duty to prevent the misconduct of the executives of another company who misappropriated company funds to make the purchase of several automobiles from the dealership); Jenkins, 851 So.2d at 783-84 (holding that a hardware store had no duty to ensure that the nitrous oxide sold by it was used for lawful purposes and not as an inhalant).
In a case similar to the one before us, the Court of Appeals for the Second Circuit concluded that a franchisor did not have a duty to prevent fraudulent conduct by its franchisee. In Cullen v. BMW of North America, Inc., 691 F.2d 1097 (2d Cir.1982), a customer paid a BMW dealer the purchase price for a vehicle. Id. at 1098. The dealer’s president absconded with the customer’s money, and the dealer failed to deliver the vehicle or to return the money. Id. The defrauded customer sued the franchisor, BMW of North America, Inc. (BMW/NA), to recover the purchase price of the vehicle. Id. At the trial in the district court, the customer prevailed against BMW/NA on a negligence claim. Id. at 1100. The customer’s theory was “that BMW/NA negligently permitted [the dealer] to continue as a BMW dealer because it had knowledge of [the dealer’s] precarious financial condition.” Id.
On appeal, the Second Circuit held that BMW/NA had no duty to prevent the customer’s loss caused by the president’s criminal activity and reversed the judgment for the customer. Id. at 1101. The Second Circuit explained:
[T]he district court improperly determined that [the customer’s] injury was reasonably foreseeable, and thus erred in finding BMW/NA liable for negligent failure to police the methods of operation of its independent franchisee and to terminate the franchise because of [the dealer’s] precarious financial condition ....
... [W]e decline to hold BMW/NA negligent and liable for damages since it could not reasonably have anticipated the crimes committed by [the dealer’s] principal, Eichler. Although BMW/NA may have been aware of [the dealer’s] shaky financial condition, that knowledge alone gave BMW/NA no cause reasonably to anticipate that Eichler would either engage in any criminal activity or that he would abscond with customer funds. In fact, no amount of supervision by BMW/NA would have enabled it to foresee Eichler’s thievery.
Id. In other cases involving the franchisors of automobile dealerships, the courts have reached similar results. See Colson v. Maghami, No. CV 08-2150-PHX-MHM, 2010 WL 2744682, at *9-10 (D.Ariz. July 9, 2010) (holding that a franchisor had no duty to supervise its automobile dealership or to warn a customer of the dealership who paid a substantial deposit for a limited edition Lamborghini Reventón and who did not receive either the car or the return of his deposit); DaimlerChrysler Motors Co., LLC v. Clemente, 294 Ga.App. 38, 668 S.E.2d 737, 747-49 (2008) (finding that a franchisor owed no duty to a customer defrauded by one of its franchisees under either the Georgia Franchise Practices Act or the franchise agreement); see also Freedman v. Tenn Dev. Corp., No. 91-475 LON, 1993 U.S. Dist. LEXIS 11021, at *39-47 (D.Del. Aug. 3, 1993) (holding that a franchisor had no duty to supervise a potential franchisee’s activities in soliciting financing from private investors).
Like the franchisor in Cullen, Jackson Hewitt did not create or control Prewett’s *31 fraud and had no reason to anticipate his chicanery. And in Cullen, the negligence asserted against BMW/NA was the failure to control the actions of its franchisee, the dealer. Here, the franchisee was SFS; Jackson Hewitt had no contractual relationship with JHIS. Thus the argument for the absence of a duty here is even stronger than in Cullen because JHIS was merely an affiliate of Jackson Hewitt’s franchisee, SFS.
For the reasons outlined above and based on the cases cited, Jackson Hewitt owed no duty to the Kamans. In the absence of a legal duty, the trial court erred in failing to grant Jackson Hewitt’s motion for directed verdict on the Kamans’ negligence claim.
VI. APPARENT AGENCY

A. Introduction

At trial, Jackson Hewitt also timely moved for a directed verdict on the Ka-mans’ apparent agency claim. Jackson Hewitt argued, among other things, that the Kamans had not proven either (1) a representation by it concerning JHIS’s status as its agent or (2) that they had reasonably relied on any such representation. The Kamans’ theory of liability based on apparent agency may be summarized as follows: Jackson Hewitt knew that its franchisee, SFS, was either operating or permitting an investment company, JHIS, to operate out of its offices. Jackson Hewitt also knew that JHIS’s method of operation suggested that Jackson Hewitt sponsored or was otherwise involved in the investment services. Despite having actual knowledge that JHIS’s activities were causing customer confusion about Jackson Hewitt’s involvement, Jackson Hewitt allowed JHIS’s operation to continue.
We conclude that the Kamans failed to prove a representation by Jackson Hewitt concerning JHIS’s status as its agent. In addition, to the extent that Jackson Hewitt made any such representation, the Ka-mans did not rely on it in deciding to invest their money with Prewett and JHIS.

B. The Doctrine of Apparent Agency

This court has stated the- basis for the doctrine of the apparent authority of agents as follows:
Apparent or ostensible authority arises where a principal allows or causes others to believe the agent possesses such authority, as where the principal knowingly permits the agent to assume such authority or where the principal by his actions or words holds the agent out as possessing it. The doctrine rests on the premises that one who allows another to serve as his agent must bear the loss which results to a third party from that party’s dealings in reliance on that agent’s supposed authority. But ... the doctrine rests on appearances created by the principal and not by agents who often ingeniously create an appearance of authority by their own acts.
Taco Bell of Cal. v. Zappone, 324 So.2d 121, 123-24 (Fla. 2d DCA 1975) (citation omitted). Thus liability based on apparent authority is a form of estoppel. Such liability flows from “the authority a principal knowingly tolerates or allows an agent to assume, or which the principal by his actions or words holds the agent out as possessing.” Owen Indus., Inc. v. Taylor, 354 So.2d 1259, 1261 (Fla. 2d DCA 1978). In considering a claim based on apparent authority, the inquiry properly focuses on the actions of or appearances created by the principal, not by the agent. Blunt v. Tripp Scott, P.A., 962 So.2d 987, 989 (Fla. 4th DCA 2007); Lensa Corp. v. Poinciana *32 Gardens Ass’n, 765 So.2d 296, 298 (Fla. 4th DCA 2000).
In order to establish a claim based on apparent agency, three elements must be proven: (a) a representation by the purported principal, (b) a reliance on that representation by a third party, and (c) a change in position by the third party in reliance on the representation. Mobil Oil Corp. v. Bransford, 648 So.2d 119, 121 (Fla.1995). With regard to the first element, the claimant must show that the purported principal represented to him or acted in such a way as to lead him to believe that the purported agent was, in fact, his agent. Vermeulen v. Worldwide Holidays, Inc., 922 So.2d 271, 275 (Fla. 3d DCA 2006). In addition, the third party’s reliance on the purported agent’s apparent authority must be reasonable. Cambridge Credit Counseling Corp. v. 7100 Fairway, LLC, 993 So.2d 86, 90 (Fla. 4th DCA 2008) (citing Lensa Corp., 765 So.2d at 298); Fla. State Oriental Med. Ass’n v. Slepin, 971 So.2d 141, 145-46 (Fla. 1st DCA 2007).
In the context of a franchisor-franchisee relationship, the mere display by the franchisee of the franchisor’s trademark and logo, or the sale of the franchisor’s products, does not constitute a representation sufficient to create an apparent agency. In Bransford, our supreme court explained:
In today’s world, it is well understood that the mere use of franchise logos and related advertisements does not necessarily indicate that the franchisor has actual or apparent control over any substantial aspect of the franchisee’s business or employment decisions. Nor does the provision of routine contractual support services refute this conclusion.
648 So.2d at 120. On the contrary, to create liability by apparent agency, the circumstances must be such as “to communicate to the plaintiff the idea that the franchisor is exercising substantial control.” Id. at 121; see Estate of Miller v. Thrifty Rent-A-Car Sys., Inc., 637 F.Supp.2d 1029, 1039 (M.D.Fla.2009) (applying Florida law). As this court has previously stated, “Florida law is clear that the use of a logo or trademark symbol alone cannot create an apparent agency.” Am. Int’l Group, Inc. v. Cornerstone Bus., Inc., 872 So.2d 333, 336 (Fla. 2d DCA 2004) (citing Bransford, 648 So.2d at 120); see also Pappas v. Smart Health U.S.A., 861 So.2d 84, 85 (Fla. 4th DCA 2003) (holding that the permissive use by a health food store of the franchisor’s name did not create an agency relationship).

C. No Representation by Jackson Hewitt

The Kamans’ claim that Jackson Hewitt knowingly allowed Prewett and JHIS to represent that their investment scheme was “backed” or otherwise sponsored by Jackson Hewitt fails because it is not supported by any evidence in the record. Granted, Jackson Hewitt learned in 2002 that Mary Valmont had an investment account with a company named “Jackson Hewitt Investment Services, Inc.” But Jackson Hewitt immediately informed Valmont it did not offer investment products and that Jackson Hewitt Investment Services, Inc., was not affiliated with Jackson Hewitt.
And Jackson Hewitt did more than just inform Valmont that it had nothing to do with Prewett’s investments. Sheila Cort referred Valmont’s e-mails to Curt M. Hapward, Jackson Hewitt’s vice president for franchisee sales administration and compliance. Hapward promptly sent a default letter and made appropriate inquiries to Jackson Hewitt’s franchisee, Allan Scott. In response to Hapward’s inquiries, Scott informed Hapward that Jackson Hewitt Investment Services, Inc., was *33 formed to acquire title to SFS’s office location and that it was not offering investment products to the public. Jackson Hewitt prudently demanded that Jackson Hewitt Investment Services, Inc., change its corporate name to delete the improper reference to Jackson Hewitt. This demand was honored, and the company’s name was changed to “J.H. Investment Services, Inc.” Jackson Hewitt’s contractual relationship was with SFS, not JHIS. Thus it lacked the ability to prohibit JHIS — an independent company — from using the letter combination “JH” in its corporate name.[4]
Jackson Hewitt might have learned more about Prewett’s activities if it had conducted an additional, in-depth investigation after receiving Scott’s response. At that point, any further investigation would probably have required sending a team of lawyers and accountants to Sarasota to conduct a field audit of JHIS’s books and records. But the appropriate inquiry here is not what Jackson Hewitt might have learned upon further investigation of Prewett and JHIS in 2002. Instead, the focus must be on what Jackson Hewitt actually knew in 2004 and 2005 when the Kamans were making their investments.
When Valmont contacted Cort at Jackson Hewitt in 2002, Jackson Hewitt had already experienced an uneventful relationship with its franchisee, SFS, for nine years. And SFS, in a letter signed by Scott, successfully allayed Hapward’s concerns about JHIS with reassuring but false information and a change of the corporate name. Although Prewett successfully solicited investments from more than one hundred people, the Kamans did not present evidence at trial that any of the investors — with the single exception of Mary Valmont — ever contacted Jackson Hewitt to inquire about its purported “backing” of Prewett’s investment schemes. The Kamans certainly did not. In fact, the undisputed evidence showed that until Prewett’s arrest in October 2006, Jackson Hewitt had no knowledge that Prewett was soliciting investments in real estate joint ventures and representing that Jackson Hewitt was involved. Jackson Hewitt did not learn about Prewett’s fraud until long after the Kamans had made their investments. Thus the Kamans failed to prove that Jackson Hewitt had knowingly permitted Prewett and JHIS to solicit their investments based on a representation that the investment program was “backed” or otherwise sponsored by Jackson Hewitt.

D. No Reliance by the Kamans

The Kamans were also unable to prove the reliance element necessary to establish an apparent agency. Indeed, the undisputed facts demonstrated that they did not rely on a purported agency relationship between Jackson Hewitt and JHIS when they decided to invest with Prewett.
First, Dr. Kaman conceded that he knew the Jackson Hewitt Tax Service office in Sarasota was a franchise operation before investing with Prewett. It follows that he could not have reasonably believed that JHIS was owned, controlled, or operated by the franchisor, Jackson Hewitt. See Mann v. Prudential Real Estate Affiliates, Inc., No. 90 C 5518, 1990 WL 205286, at *5 (N.D.Ill. Dec. 10, 1990) (holding that the employees of a local real estate franchisee could not maintain claims against the franchisor based on apparent agency when the employees knew that the franchisee was *34 independently owned and operated); Chevron U.S.A., Inc. v. Lesch, 319 Md. 25, 570 A.2d 840, 849 (1990) (holding that the customer of a Chevron dealer could not maintain an action against the franchisor on an apparent agency theory when the customer knew that the station was independently owned and operated); Mobil Oil Corp. v. Frederick, 615 S.W.2d 323, 325 (Tex.Civ.App.) (holding that in an action by a customer of a Mobil dealer against the franchisor on an apparent agency theory, the trial court improperly excluded a letter showing that the customer believed that the service station was owned by an individual, not the franchisor), affirmed in part and reversed in part on other grounds, 621 S.W.2d 595 (Tex.1981).
Second, the joint venture agreements show that the Kamans knew they were investing with the purported agent, not with the purported principal. The parties to the joint venture agreements were the Kamans and JHIS. Jackson Hewitt was not a party to the agreements, and its name does not appear anywhere in them. The Kamans did not receive any brochure, prospectus, application, or other document suggesting that Jackson Hewitt was involved in the JHIS investment scheme. Also, each of the checks the Kamans wrote for their investments was made payable to JHIS, not Jackson Hewitt. Undeniably, the Kamans knew that they were investing their money with JHIS, not Jackson Hewitt. Once again, it follows that the Ka-mans cannot have relied on any appearances or representations about Jackson Hewitt’s purported involvement in the investment scheme. See H.S.A., Inc. v. Harris-in-Hollywood, Inc., 285 So.2d 690, 693 (Fla. 4th DCA 1973) (“A corollary to the essentiality of the third party’s reliance upon the outward representations is the rule that the doctrine of apparent authority is not applicable where the third party deals with the agent not as agent but as principal.”); cf. Ilgen v. Henderson Props., Inc., 683 So.2d 513, 514-15 (Fla. 2d DCA 1996) (finding reasonable reliance by real estate purchasers where the contract provided by the franchisor for use by the franchisee used the franchisor’s name in a key section of the contract).
VII. CONCLUSION
The Kamans’ substantial losses at the hands of Prewett and JHIS are regrettable. But under the circumstances shown here, Jackson Hewitt cannot be held responsible for the consequences of Prew-ett’s swindle.
For the reasons outlined above, the trial court erred in failing to grant Jackson Hewitt’s motion for directed verdict on the Kamans’ negligence and apparent agency claims. On Jackson Hewitt’s direct appeal, we reverse the final judgment in favor of the Kamans. However, the trial court properly entered the partial summary judgment dismissing the Kamans’ actual agency claims. Thus, on the Ka-mans’ cross-appeal, we affirm the partial summary judgment that dismissed the Ka-mans’ actual agency claim. On remand, the trial court shall vacate the final judgment in favor of the Kamans and enter a final judgment for Jackson Hewitt.
Affirmed in part, reversed in part, and remanded.
NORTHCUTT, J„ Concurs.
WHATLEY, J., Concurs in part and dissents in part.

. The content of Valmont's second e-mail is quoted in the concurring and dissenting opinion.

. At the beginning of the trial, Jackson Hewitt conceded that Prewett and JHIS were selling unregistered securities and that these activities were improper. Thus neither Jackson Hewitt nor the Kamans attempted to trace the monies invested with Prewett or to ferret out the details of the fraud.

. Prewett was an officer, a director, and the registered agent of SFS.

. In accordance with its agreement with SFS, Jackson Hewitt had the right, but not the obligation, to require SFS to prohibit JHIS from operating on the premises where SFS conducted business under the Jackson Hewitt Tax Service franchise.