NOT FINAL UNTIL TIME EXPIRES TO FILE REHEARING
MOTION AND, IF FILED, DETERMINED

IN THE DISTRICT COURT OF APPEAL

OF FLORIDA

SECOND DISTRICT


OMEGA INSURANCE COMPANY,   )
  )
      Appellant,   )
  )
v.   )     Case No. 2D16-449
  )
WILLIAM WALLACE and JOAN WALLACE, )
husband and wife,   )
  )
      Appellees.   )
_____)

Opinion filed August 16, 2017.

Appeal from the Circuit Court for Polk
County; John M. Radabaugh, Judge.

Scot E. Samis of Traub Lieberman Straus
& Shrewsberry, LLP, St. Petersburg, for
Appellant.

Richard N. Asfar and George A. Vaka of
Vaka Law Group, P.L., Tampa and
Richard T. Heiden of Richard T. Heiden,
P.A., Clearwater, for Appellees.


SILBERMAN, Judge.

      Omega Insurance Company seeks review of a final judgment awarding

William and Joan Wallace just over $200,000 for subsurface remediation in their

sinkhole action. The final judgment was based on a directed verdict entered after the

trial court refused to consider the testimony of Omega's expert engineers and the

neutral evaluator regarding the proper method of subsurface repair.  We conclude that the proper method of subsurface repair is a jury question and reverse.

This appeal arises from a sinkhole insurance claim under a policy issued by Omega to the Wallaces in August 2010.  Much of the argument on appeal, as in the trial court, concerns expert testimony and the proper definition of certain terms used in the Omega policy.  The policy contains a sinkhole loss coverage endorsement which provides, in pertinent part, as follows:

> B.  COVERAGE
>
> We insure for direct physical loss to property covered under Section I caused by a Sinkhole Loss, including the costs incurred to:
> 1.      Stabilize the land and building; and
> 2.      Repair the foundation;
> In accordance with the recommendations of the professional engineer who verifies the presence of a Sinkhole Loss in compliance with Florida sinkhole testing standards and in consultation with you.

(Emphasis added.)  It also provides the following definitions:

> "Sinkhole Activity" means settlement or systematic weakening of the earth supporting such property only when such settlement or systematic weakening results from movement or raveling of soils, sediments, or rock materials into subterranean voids created by the effect of water on a limestone or similar rock formation.
>
> "Sinkhole Loss" means structural damage to the building, including the foundation, caused by Sinkhole Activity. Personal property coverage shall apply only if there is structural damage to the building caused by Sinkhole Activity.

(Emphasis added.)  The endorsement thus provides coverage for direct physical loss to covered property due to a "Sinkhole Loss" as defined in the policy.  While the policy

- 2 -

defines "Sinkhole Loss" as "structural damage to the building, including the foundation," it does not define the term "structural damage."[1]

After an initial flurry of expert reports, Omega agreed that there was a sinkhole loss and extended coverage. As is often the case with sinkhole claims, the dispute between the parties mainly concerned the proper method of subsurface repair. Omega retained an engineering firm that recommended compaction grouting to stabilize the subsurface soil and to remediate the sinkhole conditions. The Wallaces obtained a subsurface repair protocol from another engineering firm that recommended underpinning in addition to compaction grouting. Omega then requested neutral evaluation,[2] and the neutral evaluator concluded that there was no need for underpinning in addition to compaction grouting.

Despite the neutral evaluator's recommendation, the Wallaces submitted a contract for subsurface repair including compaction grouting and underpinning. When Omega refused to pay, the Wallaces sued Omega for breach of contract. In count four of the operative complaint, the Wallaces alleged that Omega breached the policy by refusing to make payment on the repair contract.

---

[1]We note that, after the cause of action accrued in this case, the legislature adopted a five-part definition of "structural damage." See § 627.706(2)(k), Fla. Stat. (2011); ch. 2011-39, § 22, at 570, Laws of Fla. This amendment does not apply retroactively. Sevila v. First Liberty Ins. Corp., 7 F. Supp. 3d 1226, 1230 (M.D. Fla. 2014).

[2]Neutral evaluation is a nonbinding method of alternative dispute resolution created specifically for sinkhole cases. § 627.7074, Fla. Stat. (2010). It is an informal proceeding in which each side presents its position to a qualified and neutral expert, who then issues a decision that is admissible at trial. § 627.7074(12), (13).

At trial, the Wallaces offered the expert testimony of engineer Sonny Gulati of Florida Testing and Environmental, Inc. ("FTE"). Gulati concluded that there had been structural damage to the building and foundation of the Wallace residence constituting a "Sinkhole Loss" as defined by the policy. Gulati applied the engineering definition of "structural damage," which required that the load-carrying capability of the foundation be compromised. He concluded that the remediation should include both compaction grouting and underpinning.

Omega offered the expert testimony of two engineers from SDII Global Corporation and the neutral evaluator. While the neutral evaluator concluded there was damage to the structure, he was not asked to give an opinion on whether there was a "Sinkhole Loss" as defined by the policy. The SDII engineers concluded there was a "Sinkhole Loss," but they applied the definition of structural damage that was used by the insurance industry and some courts.[3] This definition of structural damage only required damage to the structure rather than compromise of the load-carrying capability of the foundation. The SDII engineers and the neutral evaluator also characterized the damage as "cosmetic" because it could be repaired without repairing the foundation or load-bearing portions of the structure. They agreed with Gulati that compaction grouting was necessary for remediation, but they did not believe the damage was significant enough to require underpinning.

At the close of Omega's case, the Wallaces moved for a directed verdict on count four of the amended complaint, arguing that Gulati's opinion established the

---

[3]See, e.g., Shelton v. Liberty Mut. Fire Ins. Co., 25 Fla. L. Weekly Fed. D73a (M.D. Fla. Apr. 17, 2013), and cases cited therein.

- 4 -

method of subsurface repair as a matter of law. According to the Wallaces, the policy contained language requiring that any subsurface repair protocol be recommended by a "professional engineer who verifies the presence of a Sinkhole Loss." They asserted that their expert, Gulati, was the only professional engineer who verified that there was a "Sinkhole Loss" using what they claimed to be the proper definition of structural damage, which was the engineering definition.

Omega's counsel responded that the defense experts also found a "Sinkhole Loss" for which the policy provides coverage. Counsel maintained that in light of the conflicting expert testimony as to the proper method of repair, that issue was appropriate for resolution by the jury. Counsel added that under the Wallaces' strained interpretation of the policy, Gulati's opinion testimony on behalf of the Wallaces could not even be considered. According to counsel, the policy contained language requiring that any subsurface repair protocol be prepared "in compliance with Florida sinkhole testing standards." Counsel asserted that Gulati's protocol could not have met this standard because he did not perform any testing at the Wallace residence. Counsel stated that if the court were inclined to grant the Wallaces' motion for directed verdict, then Omega should be permitted to amend its pleadings to deny coverage. Counsel reiterated that was not the preferred option as "we want to fix the house."

The trial court granted the Wallaces a directed verdict on count four and denied Omega's motion to amend the pleadings. The court ultimately entered a final judgment awarding the Wallaces $207,628.96 (the full amount of the policy plus prejudgment interest). The court denied Omega's motions for rehearing and new trial

- 5 -

and Omega's renewed motion to require a contract for repair as a condition of subsurface repair benefits.[4]

On appeal, Omega asserts that the trial court erred in granting the Wallaces' motion for directed verdict, denying its request to amend its pleadings, and denying its motion to require a contract for repair as a condition of subsurface repair benefits. We conclude that the trial court erred in granting a directed verdict in favor of the Wallaces on the proper method of repair and reverse. This holding renders the remaining issues moot.

This court conducts a de novo review of orders granting directed verdicts. Jackson Hewitt, Inc. v. Kaman, 100 So. 3d 19, 27 (Fla. 2d DCA 2011). The issue that gave rise to the directed verdict is a matter of contract interpretation. The Wallaces relied on the portion of the sinkhole endorsement providing coverage for sinkhole damages "[i]n accordance with the recommendations of the professional engineer who verifies the presence of a Sinkhole Loss in compliance with Florida sinkhole testing standards and in consultation with you." (Emphasis added.) The Wallaces asserted that, under this provision, a subsurface repair protocol may be used only if it is

_____

[4]The sinkhole endorsement contains a loss settlement provision which provides, in pertinent part:
> We may limit any payment for Sinkhole Loss to the actual
> cash value, not including any repairs below the foundation,
> until you enter into a contract for building stabilization or
> foundation repairs. After you enter into a contract, we shall
> pay the amounts necessary to begin and perform such
> repairs as the work is performed and the expenses are
> incurred, without requiring you to advance payment for such
> repairs.

This provision is consistent with section 627.707(5)(b), Florida Statutes (2010).

recommended by a "professional engineer who verifies the presence of a Sinkhole Loss" using the engineering definition of "structural damage."

The Wallaces also relied on the portion of the sinkhole endorsement that defines "Sinkhole Loss" as "structural damage to the building, including the foundation, caused by Sinkhole Activity." They successfully convinced the trial court that the opinion of their expert was unrefuted as to the existence of structural damage and a sinkhole loss. They claimed that a directed verdict in their favor was appropriate because SDII and the neutral evaluator refused to agree that there was "structural damage to the building" using the engineering definition of "structural damage" and, therefore, did not "verif[y] the presence of a Sinkhole Loss."

There is nothing in the plain language of the insurance policy's sinkhole endorsement that requires the use of a particular definition, to the exclusion of other definitions, to determine the existence of "structural damage" in order to provide an opinion on the proper method of subsurface repair. To uphold the directed verdict below, this court would have to read additional language into the policy.[5] Cf. Roker v. Tower Hill Preferred Ins. Co., 164 So. 3d 690, 693 (Fla. 2d DCA 2015) (holding that a statute requiring the insurer to pay for repair "in accordance with the recommendations of the professional engineer" did not "require the insured to enter into a contract for the subsurface repairs recommended by the insurer's engineer to the exclusion of any other professional recommendations").

---

[5]For this same reason, we find no merit in Omega's assertion that Gulati's opinion could not be considered because Gulati did not personally perform testing "in compliance with Florida sinkhole testing standards."

Omega's expert engineers agreed that the Wallaces had a covered sinkhole loss based on damage to the structure, even though they disagreed as to the precise definition to be given to the term "structural damage" and the appropriate method of repair. The testimony of Omega's experts that there had been a sinkhole loss based on sinkhole activity that damaged the Wallace's residence was consistent with the terms of the policy. Thus, the trial court erred in refusing to consider that testimony.

By extending coverage for the Wallaces' "Sinkhole Loss," Omega necessarily conceded that there had been structural damage, as contemplated by the policy, caused by "Sinkhole Activity." Any dispute as to whether there was sufficient structural damage to constitute a "Sinkhole Loss" was rendered moot, and the only issue to be resolved at trial pertaining to subsurface damage was the proper method of repair.

Generally, the question of the proper method of subsurface repair of a home damaged by sinkhole activity is for the jury to resolve. Roker, 164 So. 3d at 694. At trial, the parties offered the testimony of four engineers, and they all agreed there was damage to the structure even though they disagreed regarding the proper method of subsurface repair. Omega's two experts from SDII and the neutral evaluator testified that compaction grouting alone was the proper protocol. The Wallaces' expert from FTE disagreed and testified that underpins should be added. Omega correctly argues that the jury should have been allowed to resolve this dispute.

We therefore reverse the final judgment and remand for a jury trial on the method of repair. We note that any judgment on remand must be consistent with the

policy's loss settlement provision which only obligates Omega to pay for subsurface repairs after the insureds enter into a contract and then only obligates Omega to make payment as the work is performed.  See Citizens Prop. Ins. Corp. v. Stieben, 200 So. 3d 215, 215-16 (Fla. 2d DCA 2016); Citizens Prop. Ins. Corp. v. Blaha, 194 So. 3d 411, 416 (Fla. 2d DCA 2016).

Reversed and remanded.

LaROSE, C.J., and CRENSHAW, J., Concur.